UNITED STATES of America, Plaintiff–
Appellant/Cross–Appellee,

v.

Kurt Henry VAN ENGEL, Defendant–
Appellee/Cross–Appellant.

Nos. 93–1184, 93–1255.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 3, 1993.

Decided Dec. 20, 1993.

R. Jeffrey Wagner, Francis D. Schmitz (argued), Eric J. Klumb, Asst. U.S. Attys., Milwaukee, WI, for U.S. in No. 93–1184.

R. Jeffrey Wagner, Paul Kanter, Chris R. Larsen (argued), Eric J. Klumb, Asst. U.S. Attys., Milwaukee, WI, for U.S. in No. 93–1255.

Janice A. Rhodes, Stephen E. Kravit (argued), Kravit, Gass & Weber, Milwaukee, WI, for Kurt Van Engel in both cases.

Before POSNER, Chief Judge, COFFEY, Circuit Judge, and ZAGEL, District Judge.*

POSNER, Chief Judge.

The increase in the number of federal prosecutors in recent years has brought in its train problems of quality control. These problems led the district judge in this case to dismiss a number of counts of a fraud indictment, 809 F.Supp. 1360 (E.D.Wis.1992), precipitating this appeal by the government under 18 U.S.C. § 3731 and a cross-appeal by the defendant asking us to throw out the entire indictment.

Kurt Van Engel, the defendant, a wholesale distributor of produce, fell out with his partners, Baake and Zingale. They brought civil RICO suits against him alleging as predicate offenses insurance fraud, the skimming of company funds by checks made out to a fictitious payee, and other criminal misconduct. Van Engel was represented in these suits by a former assistant U.S. attorney in the Milwaukee office of the Department of Justice, Stephen Kravit. Baake's lawyer reported the allegations in the RICO suits to an assistant U.S. attorney named Eric Klumb and told Kravit that he had done so. While visiting the Milwaukee office in connection with another matter, Kravit asked Klumb, with whom Kravit had an acquaintance dating from his days in the Milwaukee office, about the likelihood of a criminal investigation of Van Engel. Klumb told him that the office was not interested in Van Engel's squabble with his business partners

---

* Hon. James B. Zagel of the Northern District of Illinois, sitting by designation.

and that no criminal investigation was pending or likely. Kravit came away with the impression that a criminal investigation of his client was highly unlikely. This conversation took place in August 1987. The following month Kravit negotiated on Van Engel's behalf a settlement of Baake's suit. The terms of the settlement included an agreement by Baake to turn over to Van Engel or Kravit all the evidence, including tape recordings, on which Baake's suit had been based. The evidence was turned over to Kravit, who turned the tape recordings over to Van Engel, who may have destroyed them. Baake retained copies, in violation of the settlement agreement. Kravit made a similar though (as we shall see) seemingly much more generous settlement offer to Zingale on behalf of Van Engel, but Zingale rejected it.

In November 1987, the Milwaukee U.S. Attorney's office received a complaint from a grocery chain that Van Engel had bribed its purchasing agent to buy produce exclusively from him. A criminal investigation was launched under the supervision of assistant U.S. attorney Paul Kanter. The bribed purchasing agent was "turned," and recorded a phone conversation with Van Engel in which the latter offered him $200,000 for his silence. At about this time Kanter discovered the earlier complaint about Van Engel, the one Klumb had received. Shortly afterward Kanter received, apparently from Baake's and Zingale's lawyers, copies of the settlement agreement with Baake and the offer to Zingale. Kanter was disturbed by the provision requiring the turning over of evidence to the defendant, not realizing that this is a common provision in a civil RICO settlement. His concerns were exacerbated when Baake told one of the government investigators that Kravit had told him that he wanted the tapes so that they could be destroyed.

■ Kanter, perhaps because of lack of guidance from seasoned prosecutors, began to suspect that Kravit might have committed a crime. What crime? Since at the time of the turnover of the tapes to Kravit Van Engel had not even been the subject of a criminal investigation, let alone of a judicial proceeding—certainly none known to Kravit—Kravit could not have been guilty of ob-struction of justice even if he had destroyed the tapes on the spot rather than turning them over to Van Engel. The federal obstruction of justice statute, 18 U.S.C. § 1503, is limited to obstruction of a judicial proceeding, and there was no such proceeding either when Kravit received the tapes or when he turned them over to Van Engel. *United States v. Neal,* 951 F.2d 630, 632 (5th Cir. 1992); *United States v. Vesich,* 724 F.2d 451, 454 (5th Cir.1984). In special circumstances an obstruction of a judicial proceeding might occur time-bomb fashion before the proceeding had begun. In *United States v. Lallemand,* 989 F.2d 936, 938–39 (7th Cir.1993), we gave the example of a blackmailer who before even committing the crime instructs an accomplice to kill his victim and any other witnesses should the victim report the blackmail attempt. Nothing of the kind is suggested here. Even Van Engel has not been charged with obstruction of justice arising out of the disappearance of the tapes.

■ Kravit might conceivably have been guilty of violating 18 U.S.C. § 1510(a), which makes it a crime to bribe someone to "obstruct, delay, or prevent the communication of information relating to a violation of any criminal statute of the United States … to a criminal investigator." Part of the money paid in settlement of Baake's suit was presumably for the turnover of the tapes and other documents, and if the object was to "prevent the communication of [the information contained in them] … to a criminal investigator," Kravit, if he shared and tried to further the object, might be thought to have aided and abetted a violation of the statute by his client. Some support for this theory might be found in the fact that the settlement offer which Kravit made to Zingale on Van Engel's behalf was for $1.5 million, even though Baake had settled for only $450,000. It is unclear, however, whether the statute is applicable if there is no criminal investigation known to be in progress. *United States v. Daly,* 842 F.2d 1380, 1390–91 (2d Cir.1988); and compare *United States v. Leisure,* 844 F.2d 1347, 1364 (8th Cir.1988), with *United States v. Carzoli,* 447 F.2d 774, 779 (7th Cir.1971). It is also unclear whether either the settlement with

Baake or the offer to Zingale was excessive in relation to a fair estimate of the expected value of their legal claims, which may not have been identical; whether, when the offers to Baake and Zingale were made, Van Engel or Kravit anticipated that Van Engel was likely to be prosecuted; whether Kravit had an improper purpose in negotiating for what as we have said is a common term in a civil RICO settlement agreement; and whether Kanter or others in the Milwaukee office of the Justice Department had thought through the question of Kravit's potential criminal liability for his role in the settlement negotiations.

Whatever doubts Kanter should have had about such liability, he nevertheless launched a sting operation against attorney Kravit. The first step was to pretend to serve Baake with a grand jury subpoena. Since the settlement agreement required Baake to report to Van Engel or his lawyers any communication with law-enforcement authorities concerning the civil suit (the agreement expressly authorized Baake to make such communications—it was not intended to silence him), the "subpoena" gave Baake a pretext to call Kravit. In the phone conversation, which took place on May 13, 1988, and was recorded at the government's direction, Baake told Kravit that he had received a grand jury subpoena and Kravit responded by suggesting that he hire a lawyer. Kravit said nothing remotely improper in the conversation. Baake made further recorded phone calls to Kravit, none of which turned up evidence that Kravit was or had been obstructing justice, bribing potential witnesses, or otherwise acting improperly. Nevertheless in November 1988 a grand jury subpoena—a real one—was issued to Kravit, directing him to produce all evidence that had been furnished to him pursuant to the settlement agreement with Baake. He produced documents, but no tapes.

In the summer of 1989, with the investigations of both Van Engel and Kravit continuing, Kravit was informed—not by the government but by the lawyer for a witness—that he was the target of a criminal investigation. Until then he had been representing Van Engel in the criminal investigation of the latter. As soon as he discovered that he himself was under investigation, he withdrew and Van Engel retained substitute counsel. After more dithering by the government (including the recusal of the entire Milwaukee office because of Kravit's former employment there), the investigation was finally closed in May 1990, having obtained in two years no evidence of any criminal misconduct. Kravit resumed representing Van Engel, who was finally indicted.

The indictment contained 89 counts. Many of these either were barred by the statute of limitations or were based on criminal statutes that had been enacted after Van Engel's alleged crimes, which stretched back to the early 1970s. The judge dismissed a total of 56 counts on these and other grounds, and the government does not appeal from any of these dismissals. The remaining 33 counts charged Van Engel with having violated the mail fraud statute by defrauding an insurance company and grocery stores, obstructed justice, violated the RICO statute, and committed tax fraud. The obstruction of justice count is based on Van Engel's attempt to bribe the grocery chain's purchasing agent to remain silent.

The judge dismissed the 12 counts involving RICO and tax fraud as a sanction for what he regarded as the government's interference with Van Engel's Sixth Amendment right to counsel through the protracted criminal investigation of attorney Kravit. He picked the RICO count because it was the most costly and time-consuming to defend and the tax counts because the government could recoup its tax losses in civil proceedings against Van Engel. While critical of the government's conduct with regard to the grand jury that had indicted Van Engel (there were a series of questionable acts, including unauthorized disclosure of matters before the grand jury, but we need not prolong this opinion with a recital of them), he declined to dismiss the entire indictment as a sanction, precipitating the cross-appeal.

■ We can dispose of the cross-appeal quickly. We have no jurisdiction. Interlocutory appeals are even more disfavored in the criminal than in the civil arena, *United States v. Hollywood Motor Car Co.*, 458 U.S. 263,

265, 102 S.Ct. 3081, 3083, 73 L.Ed.2d 754 (1982) (per curiam); *Flanagan v. United States,* 465 U.S. 259, 264–66, 104 S.Ct. 1051, 1054–55, 79 L.Ed.2d 288 (1984), because of what is believed to be an overriding interest in prompt disposition of criminal cases. Compare, for example, the ten-day limit on taking a criminal appeal with the thirty-day and sixty-day limits in ordinary civil cases. Fed.R.App.P. 4. The only reason the government is allowed to appeal from the dismissal of fewer than all counts of an indictment is that it cannot appeal from any acquittal that might result from the truncation of the indictment, an acquittal that by operation of double jeopardy might preclude a retrial of the dismissed counts even if the dismissal were reversed on appeal. This ground for an interlocutory criminal appeal is exceptional, and is obviously not applicable to the cross-appeal in this case. Because interlocutory criminal appeals are extremely rare, the application of the doctrine of pendent appellate jurisdiction in criminal cases, the only possible jurisdictional basis for the cross-appeal, is correspondingly rare although not completely unknown. *United States v. Zafiro,* 945 F.2d 881, 885 (7th Cir. 1991), aff'd, — U.S. —, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). We certainly have no basis for thinking that it should be given a more generous scope in the criminal than in the civil setting, and we must insist therefore at a minimum that the main and pendent claims display a very large degree of overlap so that the pendent claim is unlikely to slow down the case by making the appeal more complicated. That condition is not fulfilled here. The main appeal concerns alleged infringement by the government of Van Engel's right to counsel; the pendent appeal concerns alleged infringement of his right to a grand jury. The facts and legal principles bearing on the infringements are different. So we shall confine our consideration of the merits to the main appeal.

■ The Department of Justice wields enormous power over people's lives, much of it beyond effective judicial or political review. With power comes responsibility, moral if not legal, for its prudent and restrained exercise; and responsibility implies knowledge, experience, and sound judgment, not just good

faith. Someone in the Milwaukee U.S. Attorney's office should have known that the turnover provision in the Baake settlement was not a red flag of criminal behavior by the lawyer who had negotiated it on the defendant's behalf and that even Baake's allegation that Kravit wanted the tapes so that they could be destroyed was not in itself an allegation of criminal misconduct. (If it were, lawyers and their clients could never throw away a scrap of paper.) The record is not entirely clear on whether Baake's allegation related to a time when Kravit would have known that a criminal investigation of Van Engel was under way or imminent. But it seems that Baake was merely explaining (or conjecturing) why the turnover provision had been included in the settlement agreement in the first place, an agreement made before Kravit had reason to believe that Van Engel would be the subject of a criminal investigation. Baake's allegation thus provided no basis for suspicion that Kravit had been trying to bribe Baake (and even less basis for suspicion that he had engaged in obstruction of justice); nor did the size of the settlement offers, considered in isolation from the merits of Baake's and Zingale's claims against Van Engel, which the prosecutors did not investigate in any depth.

On meager grounds the U.S. Attorney's office launched a sting operation against the lawyer for an individual under criminal investigation by the same office. Although the operation produced zero evidence or leads to evidence of illegal conduct, it dragged on for two years. A questionable employment of the federal government's power, to say the least—but did it violate any rights of Van Engel? The judge thought it undermined Kravit's effectiveness in negotiating with the government on Van Engel's behalf during the investigatory stage of the proceedings against Van Engel, delayed the indictment, imposed additional expense on Van Engel, and may undermine Kravit's representation of him at trial by requiring Kravit to testify as a witness to the obstruction of justice charge. In the judge's mind these things added up to a violation of the Sixth Amendment, though he did not dismiss the obstruction charge.

Consider first the delay in indicting Van Engel. His alleged crimes span a period from the early 1970s to 1987, and, given the government's heavy burden of proof in a criminal case, delay usually works to the defendant's advantage. This is in general, not in every case; sometimes, preindictment delay can so work to the defendant's disadvantage as to be deemed to deny him due process. *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977). But only when there is a tangible showing of prejudice, such as the loss of a vital defense witness. *United States v. Marion*, 404 U.S. 307, 325, 92 S.Ct. 455, 466, 30 L.Ed.2d 468 (1971); *United States v. Loud Hawk*, 474 U.S. 302, 315, 106 S.Ct. 648, 656, 88 L.Ed.2d 640 (1986); *United States v. Anagnostou*, 974 F.2d 939, 941–42 (7th Cir. 1992). The fact that the defense was "somewhat prejudiced" will not do. *United States v. Lovasco, supra*, 431 U.S. at 796, 97 S.Ct. at 2052; *Wilson v. McCaughtry*, 994 F.2d 1228, 1233 (7th Cir.1993); *United States v. Nichols*, 937 F.2d 1257, 1261 (7th Cir.1991). Even concrete prejudice may not be enough; as suggested in *Wilson* and even more emphatically in *Anagnostou*, see 994 F.2d at 1233, with support in the Supreme Court's decisions in *Lovasco* and *United States v. Gouveia*, 467 U.S. 180, 192, 104 S.Ct. 2292, 2299–2300, 81 L.Ed.2d 146 (1984), the defendant may have to show that the government's delay was deliberate, that it was trying to wrest a tactical advantage by delay. And the anxiety of uncertainty is not an acceptable substitute for a concrete showing of prejudice, *United States v. Anagnostou, supra*, 974 F.2d at 942 n. 1, let alone for deliberate governmental misconduct. Nor is added expense. *Cobbledick v. United States*, 309 U.S. 323, 325, 60 S.Ct. 540, 541, 84 L.Ed. 783 (1940).

In any event *Lovasco* and the cases following it are due process cases, and the district judge based his ruling on the Sixth Amendment's right to counsel. Even when preindictment delay makes it more difficult for a defendant to mount an effective defense, it does not deny him the effective assistance of counsel. Anyway there is no evidence that the preindictment delay in this case will impede Van Engel's defense at trial in the least.

It is possible that if Kravit had not been under investigation, the prosecutors would have been more forthcoming in negotiating with him a plea bargain for Van Engel that the latter would prefer to the uncertainties of trial; and it is possible also that after the dust finally settled and Kravit was cleared, the chance for favorable plea negotiations had been lost, because the government had invested a lot in the investigation, reducing the incremental cost of pushing on to a trial, and maybe because Van Engel had lost the chance to drive a good bargain by turning someone else in. Both points are speculative, however, and only the first bears on the right to counsel at all. *United States v. McLain*, 823 F.2d 1457, 1464 (11th Cir.1987). An attempt to build a Sixth Amendment violation on them is doomed in any event because the right to counsel which that amendment confers does not attach until adversary judicial proceedings (indictment, arraignment, information, or preliminary hearing) have begun. *McNeil v. Wisconsin*, 501 U.S. 171, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991); *United States v. Gouveia, supra*, 467 U.S. at 188–90, 104 S.Ct. at 2297–99. Plea bargaining often does, and here did, occur before then. It is true that one can't tell from the opinion in *United States v. McLain, supra*, whether the plea bargaining that the investigation of the defendant's lawyer was alleged to have interfered with occurred before or after indictment; but no inference can be drawn that the court would have deemed this question immaterial had it been raised.

The preindictment investigation of Kravit could violate the Sixth Amendment, therefore, only if it affected his representation of Van Engel at the later stages of the case, in particular the trial. But how could it have done so? It is true that Kravit is a potential witness on the obstruction of justice charge; he may be asked to testify whether he ever gave Van Engel reason to believe that the latter was under investigation when he bribed the purchasing agent. But the possibility that Kravit might be called to testify on that subject has nothing to do with

the investigation of his role in negotiating with Van Engel's partners. There is no basis for concern that *that* investigation will turn out to have prevented Van Engel from being represented at trial by the counsel of his choice—namely Kravit—or that it will undermine Kravit's effectiveness in that role. *Wheat v. United States*, 486 U.S. 153, 159, 108 S.Ct. 1692, 1697, 100 L.Ed.2d 140 (1988); *United States v. Lowry*, 971 F.2d 55, 59 (7th Cir.1992). Previous cases in which the investigation of a lawyer has been claimed to violate the client's right to counsel have involved investigations that were going on while the client was being tried. See, e.g., *Thompkins v. Cohen*, 965 F.2d 330, 332 (7th Cir.1992); *United States v. Balzano*, 916 F.2d 1273, 1293 (7th Cir.1990); *United States v. Greig*, 967 F.2d 1018, 1022–23 (5th Cir. 1992); *Government of the Virgin Islands v. Zepp*, 748 F.2d 125, 136 (3d Cir.1984); *United States v. Cancilla*, 725 F.2d 867, 869–71 (2d Cir.1984). In no previous appellate case has an investigation of a defendant's lawyer that ended before the trial began been held to interfere with the client's Sixth Amendment rights, let alone an investigation that exonerated the lawyer.

 Even if the criminal investigation of Kravit had invaded an interest that the Sixth Amendment protects, there would be a question whether a criminal investigation of a lawyer that is conducted in good faith can ever invade the Sixth Amendment rights of the lawyer's clients. *Weatherford v. Bursey*, 429 U.S. 545, 558, 97 S.Ct. 837, 845, 51 L.Ed.2d 30 (1977), hints that the answer is "no," but the question has never received sustained judicial attention; the previous cases have focused, as have we, on whether the investigation made the lawyer's representation of his client ineffective. The decision to conduct a criminal investigation is not subject to judicial review unless invidious criteria such as race or religion infect the decision, *Wayte v. United States*, 470 U.S. 598, 608, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547 (1985); *Oyler v. Boles*, 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446 (1962); *United States v. Giannattasio*, 979 F.2d 98, 100 (7th Cir.1992); and lawyers enjoy no immunity from the nation's criminal laws. Judges should be reluctant to deter criminal investigations of lawyers by holding over the government's head the threat of dismissing suits against the target's clients should the investigation fizzle. The government in this case virtually concedes the ineptitude of its investigation of Kravit. But in the usual case judges do not have reliable criteria for assessing the care with which a criminal investigation is conducted, and should therefore hesitate to entertain complaints by criminal defendants that their lawyers were investigated unnecessarily. Deliberate harassment is different (though we can find no cases), but is not claimed here.

 Since there was no violation of Van Engel's rights, there was no basis for imposing a sanction tantamount to a partial acquittal. A federal judge is not authorized to punish the misconduct of a prosecutor by letting the defendant walk, unless the misconduct not only violated the defendant's rights but also prejudiced his defense, and neither condition is satisfied here. *United States v. Morrison*, 449 U.S. 361, 365, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981); *United States v. Payner*, 447 U.S. 727, 742 n. 9, 100 S.Ct. 2439, 2449 n. 9, 65 L.Ed.2d 468 (1980). The fact that the judge in this case dismissed fewer than all the counts in the indictment does not affect the principle: a defendant is not entitled to be given an advantage at trial by way of remedy against government misconduct that did not infringe his rights. It is word play to reply that a criminal defendant has a "right" not to be subjected to outrageous government conduct. A few cases (though none in this circuit, as we noted in *United States v. Olson*, 978 F.2d 1472, 1481 (7th Cir.1992)), building on dicta in *United States v. Russell*, 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642–43, 36 L.Ed.2d 366 (1973), have required the acquittal, on grounds of outrageous government misconduct, of criminal defendants who could not quite fit themselves within the contours of the defense of entrapment. These cases do not speak any recognizable language of rights; they emphasize the unseemliness, inefficiency, and danger to innocent third parties of sting operations in which the government creates an elaborate criminal enterprise the better to ensnare persons disposed to criminal activity.

*United States v. Luttrell,* 889 F.2d 806, 811–13 (9th Cir.1989); *United States v. Twigg,* 588 F.2d 373, 380–82 (3d Cir.1978). These cases, criticized in *United States v. Santana,* 6 F.3d 1, 3–4 (1st Cir.1993), and *United States v. Miller,* 891 F.2d 1265, 1271–73 (7th Cir.1989) (concurring opinion), are not easily reconciled with the Supreme Court's decisions cited above that postdate *Russell* and hold that a federal judge cannot punish the prosecutor at the expense of the law-abiding public. The defense of entrapment is based on the idea that the legislature in enacting criminal law does not intend the government to turn people into criminals. The basis of the defense of "outrageous prosecutorial misconduct" has never been satisfactorily articulated but seems an extension of the idea behind exclusionary rules, that the only effective way of deterring prosecutorial misconduct is to make the conviction of the guilty more difficult. Such rules are no longer much in vogue in federal jurisprudence. See, e.g., *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). The entrapment defense stands on firmer footing, being intended for the protection of people who would be innocent if the government had not furnished an overpowering inducement or an essential opportunity.

It is almost superfluous to add that a remedy which consists of striking counts from an indictment bears very little relation to the wrong. *United States v. Morrison, supra,* 449 U.S. at 365–66, 101 S.Ct. at 668–69. The selection of the tax counts to drop was particularly arbitrary. And after 12 counts were dropped, 21 remained. We do not know—and we doubt that the district judge knows—enough about the government's charging and trial strategy to estimate the magnitude of the sanction that he imposed and compare it to the wrong allegedly done Van Engel: which was not, however—and this is our essential point—a legal wrong.

The judge's approach had the further defect of prematurity. The time to assess an alleged interference with the right to counsel is after the trial. If Van Engel is acquitted, the issue will be moot, since the added delay and expense that he incurred are not sources of legal entitlement; they are burdens of citizenship that Congress has not chosen to alleviate by compensating acquitted persons. If he is convicted, it will be time enough to assess the effect if any which the investigation of Kravit had on his ability to defend Van Engel effectively. Although determining that effect would no doubt be difficult, predicting the effect is hopeless.

The judgment is reversed, and the cross-appeal dismissed for want of jurisdiction.