**UNITED STATES of America, Plaintiff,**

v.

**Codell GRIFFIN, Defendant.**

**No. 89 CR 909–10.**

United States District Court,
N.D. Illinois,
Eastern Division.

June 13, 1994.

Scott Lassar, First Asst. U.S. Atty. and Barry R. Elden, Asst. U.S. Atty., Chicago, IL, for the U.S.

Richard Kling, Chicago Kent College of Law, Chicago, IL, for defendant Griffin.

### MEMORANDUM OPINION AND ORDER

HOLDERMAN, District Judge:

Approximately a year ago on June 4, 1993, this court ordered a new trial as to certain defendants in this case. *See United States v. Burnside,* 824 F.Supp. 1215 (N.D.Ill.1993). The basis of that ruling was that the government had violated the defendants' due process rights during the defendants' trial in 1991 by knowingly failing to disclose information required to be disclosed under the doctrine of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).[1] The facts underlying that June 4, 1993 ruling were established primarily at post-trial hearings conducted by this court in November and December of 1992. Those facts are detailed in the *Burnside* opinion and will not be repeated here. The government had disputed the magnitude and materiality of the undis-

---

1. Two other judges of this district, the Honorable Marvin E. Aspen and the Honorable Suzanne B. Conlon, also conducted evidentiary hearings in 1992 and 1993 in the associated case, 89 CR 908. Those judges also determined that new trials were necessary as to the trials over which they presided. *See United States v. Boyd,* 833 F.Supp. 1277 (N.D.Ill.1993) (Aspen, J.); *United States v.*

*Andrews,* 824 F.Supp. 1273 (N.D.Ill.1993) (Conlon, J.). The Honorable Richard Mills, sitting by designation in this district, determined, as to the trial over which he presided in case No. 89 CR 908, that, though the government's conduct was "outrageous," no new trial was necessary. *United States v. Bates,* 843 F.Supp. 437, 440 (N.D.Ill. 1994).

closed *Brady* evidence. The government, however, did not pursue an appeal from this court's June 4, 1993 decision granting a new trial.

No new trial in this case has occurred. The government instead moved to dismiss the indictment's charges against certain defendants and entered into plea agreements with the remaining defendants. Those plea agreements provided more lenient sentences than had previously been sought by the government before the *Brady* violations were revealed. For example, after the 1991 trials, but before the 1992 post-trial hearings in this case, the government had recommended the following sentences for the three defendants in the *Burnside* trial: 1) 160 years for defendant Thomas Burnside; 2) 80 years for defendant Codell Griffin; and 3) life for defendant C.D. Jackson. After this court set the date for the retrial of defendant C.D. Jackson, the government, pursuant to a plea agreement, allowed defendant Jackson to plead guilty to a superseding misdemeanor marijuana possession charge for time served, and moved to dismiss the felony charge in the indictment against defendant Jackson. The government also filed a motion to dismiss all charges against defendants Burnside and Griffin stating:

> Because the post-trial hearings in this case have undercut the viability of certain witnesses that testified in the first trial, the available evidence appears insufficient to prosecute Burnside and Griffin.

(Government's Motion to Dismiss Indictment Against Burnside and Griffin, filed January 27, 1994, ¶ 3.)

Furthermore, rather than litigate the new trial motions filed by other defendants in this case, whose convictions in their 1991 trial (the *Bingham* trial) were also tainted by the *Brady* violations, the government moved to dismiss the indictment after filing a single-count superseding criminal information as to each defendant. Pursuant to plea agreements, the government reduced its recommended prison sentences as to each of the ten defendants convicted in the *Bingham* trial as follows:

| Defendants Convicted in Bingham trial | Government's Initial Recommended Sentences | Government's Post–Disclosure Agreed Sentences |
| --- | --- | --- |
| Kenny Bingham | 15 years (non-guidelines) | 4 years, 5 months, 25 days (non-guidelines) |
| Johnny Brown | 27–33 years (guidelines) | 6 years (non-guidelines) |
| David Carter | Life (guidelines) | 8.5 years (non-guidelines) |
| Herbert Dinkins | Life (guidelines) | 6 years (non-guidelines) |
| Paul Downie | 27–33 years (guidelines) | 6 years (non-guidelines) |
| Roderick Haygood | Life (guidelines) | 7.5 years (non-guidelines) |
| Darryl Lamb | 27–33 years (guidelines) | 6 years (non-guidelines) |
| Virn Polk | 30 years-life (guidelines) | 6 years (non-guidelines) |
| Dwayne Price | Life (guidelines) | 6 years (non-guidelines) |
| Michael Sing | Life (guidelines) | 6 years (non-guidelines) |

Additionally, the government entered into plea agreements with defendants Ronald Jennings and Robert Johnson, who had been fugitives during the 1991 trials at which the *Brady* violations occurred. The government agreed to non-guideline prison terms of four years for Jennings and two years and six months for Johnson. This court imposed the Rule 11(e)(1)(C) sentences as to the charges to which defendants Jennings and Johnson pleaded guilty. When, however, the court scheduled trial dates on other pending charges to which defendants Jennings and Johnson had pleaded not guilty, the government refused to proceed to trial, citing the disclosure of the previously concealed *Brady* material as a reason.

One defendant, Codell Griffin, who was previously convicted in the *Burnside* trial

and subsequently granted a new trial, objected to the government's motion to dismiss the charges against him. Defendant Griffin and his counsel, Richard Kling, armed with the previously concealed *Brady* material, are apparently willing to take the risk of a new trial if this court does not grant either Griffin's or the government's pending motion to dismiss. The court, and apparently the government, now believes defendant Griffin's chances of an acquittal are substantial. Indeed, the government has decided not to call Harris and Evans, who were previously the government's key witnesses, to testify again at any new trial.

After this court's opinion in 1993 and thus far in 1994, certain additional undisclosed *Brady* information, which had been in the government's possession since the time of the 1991 trials, was disclosed for the first time. Among other things the government possessed, but did not disclose, were government log books, prepared and maintained by government personnel at the Metropolitan Correctional Center ("MCC") in Chicago. These log books contained entries detailing activities observed by government personnel on the 6th floor unit of the MCC, the unit where most of the government's cooperating "El Rukn" witnesses had been during the trial, post-trial hearings and thereafter.

Additionally in 1994, the government first disclosed evidence of tape recordings of certain 1992 telephone conversations between certain of the cooperating El Rukn witnesses and government personnel, as well as others, over U.S. Attorney's Office's phone lines.

Other previously undisclosed information, known to government personnel during the 1991 trials and 1992 post-trial hearings, was also revealed for the first time after the hearings, during the course of the investigation conducted by the Department of Justice ("DOJ") Office of Professional Responsibility ("OPR") regarding "Alleged Misconduct in the Chicago USAO [United States Attorney's Office]." The court will address each in turn.

## I. *MCC Unit 6 Log Books*

On April 14, 1992 this court entered an order requiring the production of books, records and other documents by the United States Bureau of Prisons. That order was initially proposed by Richard Kling, defense counsel for defendant Codell Griffin. The proposed order was modified by Assistant U.S. Attorney ("AUSA") Michael Shepard after he consulted with MCC personnel, Bureau of Prisons ("BOP") personnel and U.S. Attorney Office's personnel, including AUSA William Hogan. After AUSA Shepard's modifications were accepted by defense counsel, the April 14, 1992 order was entered by this court, without further modification, as an agreed order.

That order was entered to obtain all the information in the possession of the BOP which would assist this court's post-trial determination as to any illegal drug use by cooperating government witnesses, Henry Harris and Harry Evans, who had been housed on the 6th floor of the MCC.

Despite the fact that the order called for all documents and information regarding Harris and Evans' drug use, drug tests and:

g. any and all movement logs which would log the movement into and out of the Metropolitan Correctional Center of Harry Evans and Henry Leon Harris except that this order does not include information revealing the present or future whereabouts of Evans or Harris;

h. visitor records reflecting any and all dates of visits (not to include the names, addresses or other personal information of visitors) Harry Evans and Henry Leon Harris had while housed at the Metropolitan Correctional Center,

(April 14, 1992 Order, 89 CR 909), that information was withheld by the government from the court and defense counsel.

Among the materials not produced, which should have been produced in April 1992, as AUSA Shepard subsequently conceded (November 12, 1993, Tr. 38), were the Unit 6 Log Books, which showed "the movement into and out of the Metropolitan Correctional Center of Harry Evans and Henry Leon Harris" as well as "dates of visits ... that Harry Evans and Henry Leon Harris had while housed at the Metropolitan Correction-

al Center." (April 14, 1992 Order, Case No. 89 CR 909).[2]

Noted by the MCC Unit 6 personnel on April 2, 1989 in these log books was the following:

NOTE: Keep a watch on Inmate Harris [number deleted]. At times he appears to be under some intoxicants.

Among other entries pertaining to Harris and Evans in the Unit 6 Log Books is an entry written in red ink on April 25, 1989 between 2:30 and 3:00 p.m.:

NOTE: Inmate Harris [number deleted] appears to be under some type of intoxicants. His speech is slurred and he can't seem to walk straight at any distance. This is the third (3) time this inmate has appeared in this state.

In addition to entries regarding the effects of Harris' drug use was a description of a social visit, in the early afternoon of May 11, 1989, Henry Harris received from his girlfriend Ola Morris. Harris had previously distributed illegal drugs with Morris before his arrest. Later that day, Harris provided the urine specimen which tested positive for illegal drugs noted in the "Rosenthal Memorandum" and the "Mildner Memorandum." The next day, May 12, 1993, Harris testified in the grand jury and was asked to confirm the written statement AUSA Hogan had prepared. Harris complied.

The following day, May 13, 1989, the MCC Unit 6 Log Books state that at 3:52 p.m. in the afternoon:

Inmate Harris strip searched again after I saw him sniffing something in the Rec. Room. Strip search had negative results.

None of this was disclosed at the post-trial hearings.

As noted in the *Burnside* opinion, Harris not only admitted to another MCC inmate that he, Harris, was "high" while testifying in the grand jury, Harris was seen by other MCC inmates around that same time, "snorting something out of a little white piece of paper", *Burnside*, 824 F.2d at 1227–28. The government concealed the Unit 6 Log Books during the post-trial hearings which contained information that MCC personnel observed the same conduct by Harris "sniffing something in the Rec. Room."

Other evidence noted in the Unit 6 Log Books which corroborates the post-trial evidence of Harris' illegal drug acquisition and illegal drug use,[3] and which the government should have provided for the court's *in camera* review, were the Unit 6 Log Books' entries regarding Harris and Evans' threats to commit suicide. The government should have also revealed the notes in the Unit 6 Log Books about Evans hallucinating in late May and early June 1991, around the period he was testifying at the *Bingham* trial.

Moreover, the entry in the MCC Unit 6 Log Books for June 27, 1991 (during the time Harris was testifying at the *Bingham* trial) states:

Inmate Harris [number deleted] received 15 days D/S [disciplinary segregation] + 7 Day Loss of Commissary from DHO. No. #2 officer.

As was discussed in the *Burnside* opinion, Harris told the *Bingham* trial prosecutor, AUSA Theodore Poulos, about the June 27th disciplinary hearing right after it occurred. Poulos informed AUSA William Hogan, and either in the afternoon of June 27, 1991, or the next morning, AUSA Hogan phoned MCC Executive Assistant Robert Hafer and

---

2. The government was already obligated under the doctrine of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) to produce the MCC Unit 6 Log Books for use at the post-trial hearings which addressed whether Henry Harris and Harry Evans had used illegal drugs while housed on Unit 6—the 6th floor—of the MCC. Those logs contained written notations by MCC personnel corroborating Harris and Evans' illegal drug use beyond their drug use which resulted in the positive drug tests reported to the U.S. Attorney's Office. (Rosenthal Memorandum; Mildner Memorandum.)

3. For example, at the post-trial hearings it was proven that Harris along with other cooperating "El Rukn" government witnesses, such as Harry Evans and Earl Hawkins, obtained drugs from their girlfriends who were social visitors at the MCC and at the U.S. Attorney's Office. *Burnside,* at 1228–32. The Unit 6 Log Books note that Harris received a female social visitor on May 27, 1991—three days before his May 30, 1991 refusal to provide a urine specimen for drug testing—just days before he began his testimony in the *Bingham* trial.

complained about Harris' June 27th disciplinary hearing. (*Burnside,* 824 F.2d at 1263.) According to Harris, that disciplinary sanction was rescinded and not served.

All of this information was *Brady* material at both the 1991 trials conducted in this case and the 1992 post-trial hearings, and should have been produced by government counsel.

## II. *The 1992 Tape Recorded Phone Conversations*

As stated earlier, the government did not reveal until 1994 that it possessed tape recordings of various phone conversations which took place in about mid–1992 among certain of the cooperating "El Rukn" witnesses, U.S. Attorney's Office personnel, government personnel assigned to the "El Rukn" prosecutions and others.

Not until May 1994 did the government provide draft summaries of those conversations recorded by the government in 1992. Several of those summaries explicitly describe the phone conversations, forwarded through the U.S. Attorney's office in 1992, evidencing Evans' continuing acquisition and use of illegal drugs. (Government's Revised Submission of Summaries of Conversations filed May 26, 1994.)

The summaries filed in this case on May 26, 1994 indicate that AUSA Hogan, along with other government personnel, forwarded phone calls for "El Rukn" witness Harry Evans to his mother, who was suspected of being Evans' source of illegal drugs. For example, on April 27, 1992, Evans called AUSA Hogan and after some conversation, according to the government prepared summary, the following occurred:

> ... Harry asks for a call to 624–0748, and Bill calls. Harry asks for Gladys. Harry asks her if she took care of her business. She says yes. He asks if she got her "birth certificate and stuff," and she says no. Harry asks if she knows what he wants her to do and she says yes. There is some reference to money. Then he tells her she can't "go there" in the morning, and then gets frustrated trying to explain it to her. He tells her she has to get around 3:00 and wait till around 3:00 till Albert Smith (phonetic) comes around and she has to "directly put it in his hands, the jollies, you know what I'm saying?" **(This above may be a drug conversation.)** Harry keeps interrupting something Gladys tries to say. He tells her he is going to call her back on "the other legal." He tells her "this one is uh ..." He states: "I'm gonna call you back and they gonna ask for Miss Ray, right? Attorney. You say, 'speaking'." "Then I'll talk to you then." "Then I'll be able to call ma and everything." He then talks to her about her dressing up like a boy. (Bold face in original.)

(Govt. May 24, 1994 Summaries, p. 7.)

Another example, according to the summaries, is on May 22, 1992, when Daniel Brannigan, a Chicago police sergeant assigned to the "El Rukn" task force, answered Hogan's phone and accepted a collect call from Evans. After some discussion between Sgt. Brannigan and Evans, Evans asked Sgt. Brannigan to forward his call to his mother. The government's summary states as follows:

> Brannigan dials 224–2566 for Evans, his mother. He talks to her about having someone bring something to her. Then he tells her to give Al a "nickel," to give him dime and tell him that "half of this is yours and half of this is mine." Evans talks about ordering "a dollar and a dime." The mother is very difficult to understand. **This may be a drug conversation.** (Bold face in original.)

(Govt. May 24, 1994 Summaries, pp. 10–11.)

The recently disclosed government prepared summaries of the 1992 taped conversations reveal substantial drug trafficking by Evans over the U.S. Attorney's Office's phone lines. The summaries indicate that Evans and his mother used the code word "sandwich", "candy", and "candies," among other code words, to refer to the illegal drugs Evans' mother was supplying Evans while he was in custody.

The summary of a July 9, 1992 conversation Evans has with his mother is as follows:

> Harry to his mother, who says she is fixing him a sandwich. Harry say that Beverly won't "mess her around." He talks to this woman about meeting with some other

women and about her getting half the story from someone and half from someone else. (**This may be a drug conversation.**) (Bold face in original.)

(Govt. May 26, 1994 Summaries, p. 26.)

A month later, on August 9, 1992, Evans had another conversation with his mother, which is summarized as follows:

Harry Evans to his mother. Evans sounds groggy. He asks her how much candy she gave him. It sounds like she says, quarter. He says that when she was with Bev, did she take a while? She says about forty minutes. Harry's mother says Bev came back and said she wanted some money to get another box cuz that one wasn't no good. Harry tells her not to worry about it. She then says something about a sandwich she brought Thursday, and he says it wasn't good, that none of it was good. He says that "she mighta got a little slick." He says that he's gonna figure something out . . .

(Govt. May 26, 1994 Summaries, p. 37.)

Ten days later on August 19, 1992, the Government Summaries state:

Harry Evans to unknown female who calls 538–2106 for him. Some female answers and then he talks to someone named Harry. He asks about his grandmother. He ask to talk to Della (phonetic). (**The following is a drug conversation.**) He asks who has the rocks or roxy. A woman answers "right across the street." Harry asks, "at the bar?" And she replies, "That's what I heard." He asks who has the bomb. She answers China Man. He asks if it is "bomb," and she replies that is what she heard. He gets upset, saying, "don't tell me what you heard." She indicates that she doesn't mess with it, that she hasn't for four months. One of the women talks about a man who got 14 years for robbery. Harry asks her how much she's doing and she replies, "about three of them twenties a day." He asks her how long it took her to kick it. She says a week and a half. He asks if she was using valium. She says meth. She says it has been six months since she looked at brown dope. He says it's the other "shit" that gets her sick. She said, "What, cola?"

She says that "shit ain't nowhere," and Harry says it is somewhere. He questions her spending 60 or 30 dollars on "blow" but "$2,000 on that coke." She says that every now and then she gets out her cola, but she doesn't use the "brown shit." He tells her she needs to quit that "white shit." Harry asks little Harry if he knows China Man, and he does know him. Harry said that China Man was "down." Harry asks little Harry if he already knows "somebody with that other stuff." Little Harry responds yes, and Harry asks if it is "bomb." Harry ask him to "take care of him" because the old girl can't hang on to it long. Little Harry states something to the effect of that guy being right across the street and Harry replies, "Oh, it is? Both of them?" Little Harry says yes. Then Harry asks if Little Harry known "how to do the box," and Little Harry says yes. Harry then asks if Little Harry knows how to seal it, and Little Harry says yes. Harry says he's trying to hook something up and talks about some women trying to set up a place to live. Harry says he is going to "hook these white boys up on her" and "get the money" so he can get Little Harry ready for school. They talk about the female being stupid for messing with the "cola" because it costs more than the other "shit." Harry says he'll break the woman's nose and she won't be able to do the drugs. They talk about the guy who got 14 years for robbery, and how he had just gotten out for killing some guy. Little Harry tells a story about shooting an unloaded gun at the man who went to jail and Harry tells him not to go out like that, not to get crazy because he can't help him now. He tells him wait until he gets out to get a little crazy. They talk about an Akee or Kiponey (phonetic) who had Mercedes but is supposed to be not messing around anymore and going to school. Harry talks about some guy who thought Harry killed his father and that he was going to get him back, and Harry states that he didn't kill the man. They talk about a Big Ollie who has a Rolls Royce and that Harry looked out for him when somebody wanted to kill him. Harry talks

about Bubba Glen (phonetic) who Harry says is "on top of the world" and "on top of the whole game" holding a "whole strip down." China Man just came around, but may not be the one Harry is thinking of because the China Man he knew was form the West side and Little Harry said this new guy is from around here. Harry can't believe that the Disciples are in power and that no one is standing on them but the young bucks. Harry tells stories about Andre and Larry Burris (phonetic) who Harry is planning to get even with. (Bold face in original.)

(Govt. May 26, 1994 Summaries, pp. 29–30.)

A week later on August 26, 1992 the Government Summaries state:

Harry Evans to his mother. He says he only gets one call a day now. He tells her to give some woman a quarter that he owes her. He talks about giving him the same thing you were giving him, give him the eighty. Someone called her names, "bitch" and "whore." He begins to tell her, "remember that dollar you had," then asks her to send him a quarter. She talks about having three of something, and Harry asks three of what. She replies "candies," and Harry says something about using two of them. **(This is apparently a drug conversation.** (Bold face in original.)

(Govt. May 26, 1994 Summaries, pp. 32–33.)

Two days later on August 28, 1992, a recorded phone conversation is summarized as follows:

Harry Evans to his mother. She says that someone is following her. Everywhere she turns, she said she is seeing "Mr. Blue," but Harry said if it was anyone, it would be "Mark something." Harry assures her it doesn't have anything to do with the

Rukns. Harry tells her to hide something and refers to someone having two feet in the grave. They talk about how much money has, and he has less than he thought. His mother says something about the $75 and states that he will have to "get off that stuff." Harry states, "I can't get off of it now." She replies, "Yes, you can." He says, "No, I can't." Then he states, "Hey, you need to come out here, man, so I could talk to you." He has $80, $75, and $115, and he wants her to put it all together. She doesn't want to. He states something to the effect that when he's finished working, he wont' need her. She talks about owing people money and that it is getting on her nerves. **(This is likely a drug related conversation.)** (Bold face in original.)

(Govt. May 26, 1994 Summaries, pp. 32–33.)

These and other telephone conversations were recorded by the MCC as a regular part of its monitoring of inmates' telephone calls. Certain of the tapes summarized in the Government's May 26, 1994 Summaries were retained by the MCC to aid in the investigation of the attempted escape from custody of Jeffery Erickson, a defendant in an unrelated criminal case, on July 20, 1992.[4]

### III. Other Previously Undisclosed Information

The government also failed to disclose before this court's June 4, 1993 opinion the fact that William R. Fall, a lieutenant with the BOP who had been an SIS Technician at the MCC in 1989, had listened to a recording at the MCC of a telephone conversation between AUSA Hogan and an MCC inmate in which the inmate "reported inmates using drugs on his floor, fights, and other activities that the inmate witnessed or had become

---

**4.** During defendant Jeffery Erickson's trial at the Dirksen Federal Building he was incarcerated at the MCC. He surreptitiously obtained a handcuff key. After court had concluded on the afternoon of July 20, 1992, as Erickson was in the Dirksen Federal Building basement in the custody of Deputy U.S. Marshals on route back to the MCC, Erickson attempted to escape. In doing so, he obtained a firearm, and in a gun battle with authorities, he murdered two people, a Deputy U.S. Marshal and a Court Security Officer

from this District. Mortally wounded himself, Erickson then took his own life. An intensive investigation ensued to determine what, if any, accomplices Erickson had in obtaining the handcuff key and attempting to escape.

Personnel of the U.S. Attorney's Office were involved in the *Erickson* investigation. Consequently, both directly and under *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), the government was aware of the existence of the tapes in 1992.

knowledgeable of on his floor." (Affidavit of Lt. William R. Fall, September 16, 1993.) The tape of that conversation apparently no longer exists. (Government's Statement Regarding MCC Tape, filed January 12, 1994.)

The government recently disclosed that Henry Harris wrote AUSA Hogan a letter which AUSA Hogan received on August 23, 1990 stating that the MCC "suffers from sex and drug scandals each and everyday." (Attached to May 26, 1994 letter from AUSA Barry Elden to counsel in the "El Rukn" cases.)

The OPR investigation of the alleged misconduct has uncovered other evidence, which despite being known by the government at the time of the 1991 trials and the 1992 hearings, was never disclosed to the court or counsel. Much of that previously undisclosed evidence is detailed in the Defense Motion and Memorandum in Support of Defense Motion to Dismiss the Indictment filed January 14, 1994. It was in response to that Defense Motion that the government filed the Government's Motion to Dismiss Indictment Against Burnside and Griffin on January 27, 1994.

Although this court could further detail the various facts which prove that certain U.S. Attorney's office personnel and other government personnel continued to eschew their *Brady* and *Giglio* obligations well after the trials and even after the post-trial hearings, the court will stop here.

Based upon the facts established at the post-trial hearings and the information disclosed since then, the evidence is overwhelming that what certain government personnel did in this case is outrageous. Indeed Robert B. Lyon Jr., the DOJ attorney conducting the OPR investigation, called the matter "unprecedented." (November 12, 1993, Tr. 21).

Upholding a dismissal of a criminal indictment on the motion of the defense as a result of outrageous prosecutorial misconduct would be an unprecedented occurrence in the Seventh Circuit. *See United States v. Van Engel,* 15 F.3d 623, 631 (7th Cir.1993). At least one member of the Seventh Circuit has called for an outright rejection of allowing criminal dismissals on that basis. *See e.g., United States v. Miller,* 891 F.2d 1265, 1271 (7th Cir.1989) (Easterbrook, J., concurring).

This court need not resolve that issue here because government counsel has come to the conclusion that, under all of the circumstances, the prosecution of the sole remaining defendant, Codell Griffin, should not go forward.

 In our federal system of criminal justice, the executive branch of government is the branch with the power to prosecute criminal cases. With that power comes the right of exercising prosecutorial discretion. Government counsel in the exercise of its discretion now agrees with defendant Griffin's counsel that this case should be dismissed. It is axiomatic that the case should be dismissed.

It is the court's hope that what transpired in this case will never occur again. The government personnel involved in the improprieties which occurred in this case became so embroiled in convicting these defendants that they lost sight of justice and their constitutional responsibilities owed to all the citizens of this district.

This decision is this court's last ruling in this case. It concludes this case because there is no further case or controversy before this court. Others will have to endeavor to find the truth regarding the unresolved issues and ramifications arising from this case and the associated case, 89 CR 908.

### CONCLUSION

Defendant Codell Griffin's and the government's motions to dismiss are both GRANTED. This case is closed.