**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-1972
_____

UNITED STATES OF AMERICA,

Appellant

v.

RAYMONT WRIGHT

_____

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
(D.C. No. 2-14-cr-00292-001)
District Judge: Hon. Cathy Bissoon
_____

Argued May 24, 2018
_____

Before: MCKEE, SHWARTZ, and NYGAARD, <u>Circuit
Judges</u>.

(Opinion Filed: January 17, 2019)

_____

OPINION OF THE COURT
_____

Donovan J. Cocas, Esq.     [ARGUED]
Jane M. Datttilo, Esq.
Laura S. Irwin, Esq.
Office of the United States Attorney
700 Grant Street
Suite 4000
Pittsburgh, PA 15219

    *Attorney for Appellant*

Renee Pietropaolo, Esq.     [ARGUED]
Lisa B. Freeland, Esq.
Akin Adepoju, Esq.
Office of the Federal Public Defender
1001 Liberty Avenue
1500 Liberty Center
Pittsburgh, PA 15222

    *Attorneys for Appellee Raymont Wright*

Lawrence S. Lustberg, Esq. [ARGUED]
Gibbons, P.C.
One Gateway Center
Newark, NJ 07102

    *Attorney for Amicus Appellee National Association of
    Criminal Defense Lawyers*

SHWARTZ, Circuit Judge.

The District Court barred a retrial of and dismissed the indictment against Defendant Raymont Wright with prejudice after two juries failed to reach a verdict. The Court did so relying on its inherent authority, but without finding that any misconduct had occurred or that Wright would suffer any prejudice beyond the general anxiety and inconvenience of facing a retrial. Under such circumstances, the Court lacked the inherent authority to bar the retrial and dismiss the indictment. Therefore, we will reverse the order dismissing the indictment and remand for further proceedings.

I

In December 2014, Wright was charged with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). He pleaded not guilty and proceeded to trial in May 2016. The jury was unable to reach a verdict. A second trial was held in March 2017, and that jury was also unable to reach a verdict.

During both trials, the jury heard evidence from police officers about Wright's actions on July 24, 2014.[1] That evening, five Pittsburgh Police detectives were patrolling in two unmarked cars. Detectives Kennedy, Henson, and Baker were in the lead car, and Detectives Fallert and Goob were in the second car. Around 8:30 p.m. (when it was still daylight), Fallert and Goob saw a man, later identified as Wright, driving

---

[1] The following facts are drawn largely from the evidence presented at the first trial.

3

a car in the opposite direction well above the 25-mile-per-hour speed limit. The detectives turned around to follow Wright, and Wright sped up and turned onto a loop-shaped road. The detectives pursued Wright, who fled at a high speed and ran at least four stop signs. The lead car lost sight of Wright shortly thereafter and discontinued pursuit.

Officers in the lead car then noticed skid marks suggesting that a car had intended but failed to make a left turn at the end of a street. Officers thereafter came upon Wright's car in a parking lot below. The car had gone through a fence, over a hillside, and into the lot. The car hit two unoccupied parked cars, its tires blew out, and its windows were down.

Detectives Baker and Henson exited the vehicle at the top of the hill and remained where Wright's car broke through the fence, and Detective Kennedy drove his car down to the parking lot's entrance. Baker and Henson testified that they saw Wright search around the rear passenger seat of the car, back out of the vehicle with a black semi-automatic handgun in his right hand, and try to "rack the slide," which can insert or remove a round from the chamber. App. 118-19. They had their weapons drawn and told Wright to drop the gun. At first, Wright merely stepped back, but he eventually tossed the gun to the side, backed away, and lied on the ground. Pittsburgh police officer Elliott and his partner, who heard of the crash on the radio, were the first to reach Wright, and saw him lying on the ground with a handgun next to him. Henson stated that when he made it down to the parking lot, he heard Wright say to him, "Hey, big guy. You won this time or you won this round, something of that nature. He [Wright] said: You feel me? You won this time," which Henson understood to mean that he had just avoided a shootout or that he caught Wright

4

after the pursuit. App. 125. Henson subsequently took custody of the gun and noticed the slide lever was bent, and when he straightened it, saw the gun was loaded with eight rounds, and one in the chamber.[2]

At the close of the Government's case, Wright moved for a directed verdict, arguing that no reasonable juror could find beyond a reasonable doubt that Wright possessed the firearm. The District Court denied the motion because "the evidence does thus far demonstrate that a reasonable juror could most certainly find the Defendant guilty of the charge in this case." App. 171. Wright did not present a case.

The jury deliberated for approximately five hours and then reported to the Court that it was deadlocked. After polling the jurors to confirm they were deadlocked and further deliberations would not bring them closer to a unanimous verdict, the District Court declared a mistrial.

At Wright's March 2017 retrial, the Government presented substantially the same evidence. The Government also called Detective Kennedy and Lieutenant Palermo, who were at the scene after Wright was arrested, as well as experts who testified regarding the collection of DNA and fingerprint evidence from firearms to respond to Wright's argument at the first trial that investigators chose not to test the gun for forensic evidence in an effort to cover up that they had planted the gun at the scene.

---

[2] The parties stipulated Wright had been convicted of a qualifying felony, and an ATF Special Agent testified about the gun's interstate nexus.

At the close of the Government's case, Wright again moved for a judgment of acquittal, which the Court denied because "there is sufficient evidence in the record to establish beyond a reasonable doubt that Mr. Wright possessed the firearm in the case," App. 650. Wright did not put on a case.

The second jury deliberated for approximately three hours and then reported that it was hopelessly deadlocked. The Court polled the jury to confirm the deadlock and then dismissed the jury.[3]

After the Government notified the Court that it intended to retry the case, the Court required the parties to brief "whether the Court, through an exercise of its inherent authority, should prohibit or permit a second re-trial in this case." App. 26. After considering the parties' arguments, the District Court dismissed the indictment with prejudice, holding that it "ha[d] the inherent authority, under some circumstances, to dismiss an indictment following multiple mistrials." United States v. Wright, Crim. A. No. 14-292, 2017 WL 1179006, at *4 (W.D. Pa. Mar. 30, 2017). It reasoned that: (1) principles underlying the Double Jeopardy Clause also applied to a defendant facing a retrial after multiple mistrials, id. at *1-2; (2) other courts had dismissed indictments in similar

_____

[3] Wright asserted that in the first trial, jurors voted 8-4 for acquittal, and in the second trial, the jury was evenly split. The Government asserted that in the first trial, jurors voted 7-5 for acquittal, and in the second trial, voted 8-4 for conviction. See United States v. Wright, Crim. A. No. 14-292, 2017 WL 1179006, at *5 (W.D. Pa. Mar. 30, 2017). While Wright does not explain how he obtained these numbers, the Government said it obtained them by speaking with the jurors.

circumstances, id. at *2-3 (citing United States v. Rossoff, 806 F. Supp. 200, 202-03 (C.D. Ill. 1992); United States v. Ingram, 412 F. Supp. 384, 385 (D.D.C. 1976); Sivels v. State, 741 N.E.2d 1197, 1201 (Ind. 2001); State v. Abbati, 493 A.2d 513, 517 (N.J. 1985); State v. Moriwake, 647 P.2d 705, 712-13 (Haw. 1982); State v. Witt, 572 S.W.2d 913, 917 (Tenn. 1978)); (3) while Federal Rule of Criminal Procedure 31(b)(3) expressly allows the Government to retry a case after a mistrial, nothing in the rule "limits a court's inherent supervisory authority to dismiss an indictment in the interests of fundamental fairness," id. at *4; and (4) if the Court were to adopt the Government's position that there are no limit to the number of times the Government can retry a defendant, it would be tantamount to a "type of jury shopping" that a court should not permit, id. at *4.  The District Court also considered the factors set forth in Abbati, 493 A.2d at 521-22, and concluded that most factors supported dismissal.[4]

---

[4] The Abbati factors are

 (1) the number of prior mistrials and the outcome of the juries' deliberations, so far as is known; (2) the character of prior trials in terms of length, complexity, and similarity of evidence presented; (3) the likelihood of any substantial difference in a subsequent trial, if allowed; (4) the trial court's own evaluation of the relative strength of each party's case; and (5) the professional conduct and diligence of respective counsel, particularly of the prosecuting attorney. The court must also give due weight to the prosecutor's decision to reprosecute, assessing the reasons for that decision, such as the gravity

The Government appeals.

## II[5]

We review the District Court's order dismissing the indictment based on the Court's inherent power for abuse of discretion.[6]  See United States v. Chapman, 524 F.3d 1073,

of the criminal charges and the public's concern in the effective and definitive conclusion of criminal prosecutions.  Conversely, the court should accord careful consideration to the status of the individual defendant and the impact of a retrial upon the defendant in terms of untoward hardship and unfairness.

Wright, 2017 WL 1179006, at *4 (quoting Abbati, 493 A.2d at 521-22).  For the reasons set forth herein, we would not adopt Abbati, but even if we were to consider the Abbati factors, we would conclude that they do not support dismissal in this case.

[5] The District Court had jurisdiction pursuant to 18 U.S.C. § 3231.  We have jurisdiction pursuant to 18 U.S.C. § 3731.

[6] The phrases "inherent power," "inherent authority," "supervisory power," and "supervisory authority" are all used to describe the basis for a court action seeking to maintain the integrity of the proceedings that is not directly tethered to a specific rule, statute, or constitutional provision.  See, e.g., Carlisle v. United States, 517 U.S. 416, 426 (1996) (inherent power); United States v. Williams, 504 U.S. 36, 46 (1992) (supervisory power); Chambers v. NASCO, Inc., 501 U.S. 32, 43 (1991) (inherent power); Bank of Nova Scotia v. United

1084-88, 1090 (9th Cir. 2008) (reviewing dismissal of indictment for abuse of discretion); cf. Chambers v. NASCO, Inc., 501 U.S. 32, 55 (1991) (reviewing a court's imposition of sanctions under its inherent power for abuse of discretion); Gov't of the Virgin Islands v. Fahie, 419 F.3d 249, 258 (3d Cir. 2005) ("A trial court's remedy for a discovery violation under its supervisory powers is reviewed for abuse of discretion."). A district court abuses its discretion when it makes an errant conclusion of law, an improper application of law to fact, or a clearly erroneous finding of fact. McDowell v. Phila. Hous. Auth., 423 F.3d 233, 238 (3d Cir. 2005).

A

Federal Rule of Criminal Procedure 31 allows the Government to retry a case if the court declares a mistrial after a jury announces it is unable to reach a verdict. Specifically, Rule 31(b)(3) provides: "[i]f the jury cannot agree on a verdict on one or more counts, the court may declare a mistrial on those counts. The government may retry any defendant on any count on which the jury could not agree." Fed. R. Crim. P. 31(b)(3). The word "may" means that the Government has the

States, 487 U.S. 250, 254-56, 263 (1988) (supervisory authority); United States v. Hasting, 461 U.S. 499, 505 (1983) (supervisory power); United States v. Payner, 447 U.S. 727, 733-36 (1980) (supervisory power); United States v. Nobles, 422 U.S. 225, 231 (1975) (inherent power).

Even if we accepted the distinctions our dissenting colleague has drawn between inherent judicial powers, legislatively granted judicial powers, and supervisory powers, each category must operate within the constitutional framework, including the separation of powers.

discretion to retry a case, and nothing in the rule or its commentary provides or even suggests a limit on the number of retrials it may conduct. See United States v. Wqas Khan, No. 2:10-CR-0175 KJM, 2014 WL 1330681, at *2 (E.D. Cal. Apr. 1, 2014) ("Nothing suggests that multiple mistrials take a case out of the Rule's operation."), appeal dismissed, No. 14-10218 (9th Cir. July 9, 2014).[7] Moreover, there is nothing in

_____

[7] While Rule 31 does not limit the Government's authority to retry a case, a handful of district courts have dismissed indictments following a second hung jury, but those decisions are not persuasive. In Ingram, the district court dismissed the indictment sua sponte (without any initial objection by the Government) after two mistrials—in which jurors had voted 10-2 and 11-1 for acquittal, the defendant was jailed during the pendency of the trials, and "[t]he Government ha[d] no new proof; it simply want[ed] another chance." 412 F. Supp. at 385. The court concluded that to permit a retrial would be "to ignore the reasonable doubt standard," and so "[t]he Court's intervention [was] required in the interest of justice." Id. at 386 (citing United States v. De Diego, 511 F.2d 818, 824 n.8 (D.C. Cir. 1975); De Diego, 511 F.2d at 833 n.6 (McGowan, J., dissenting)). The Ingram court, however, relied in part on the dissent in De Diego. Cases since Ingram have applied the De Diego majority's view concerning a court's limited authority to dismiss an indictment. See, e.g., United States v. Hall, 559 F.2d 1160, 1164-65 (9th Cir. 1977) (citing De Diego and reversing the district court's dismissal of the indictment where the district court found it would be "unconscionable" to retry to the defendant); United States v. Hudson, 545 F.2d 724, 724-26 (10th Cir. 1976) (discussing De Diego and its dissent and holding a district court does not have authority to sua sponte dismiss an indictment based on the

defendant's poor health); <u>United States v. Mussehl</u>, 453 F. Supp. 1235, 1236 (D.N.D. 1978) (denying defendants' motion to dismiss the indictment based on alleged errors at trial, and citing <u>De Diego</u> for the proposition that "[t]he duty [to administer justice] encompasses the concept of review of the question whether the United States Attorney, in making his decision to prosecute, complied with the law, but does not allow the Court to question a United States Attorney's judgment decision to prosecute, when lawfully made").

The District Court also relied on <u>Rossoff</u>, where the court denied the Government's motion to dismiss the indictment under Federal Rule of Criminal Procedure 48(a), but still dismissed the indictment with prejudice. 806 F. Supp. at 202-03 (citing <u>Ingram</u>, 412 F. Supp. at 385-86). There had been two trials, and the Government sought to dismiss the indictment and refile the charges in a different judicial district. <u>Id.</u> The court determined it had authority to dismiss an indictment with prejudice if a retrial was "against the concept of fundamental fairness," <u>id.</u> at 202 (citing <u>Ingram</u>, 412 F. Supp. 384), and did so because, among other reasons, the defendant was in poor health, was under significant strain, and a majority of jurors at both trials found him not guilty, <u>id.</u> at 203. <u>Rossoff</u>, however, is distinguishable from Wright's case because in <u>Rossoff</u>, the Government sought to dismiss the indictment so that it could refile charges in a different judicial district, which caused the court to question the Government's good faith. In Wright's case, the District Court made no finding that the Government's desire to retry Wright was for an improper purpose.

In addition, and significantly, neither <u>Ingram</u> nor <u>Rossoff</u> addressed the doctrine of separation of powers. Rather, each essentially relied on a general concept of fairness

11

the text that empowers a court to prohibit the Government from retrying a case.[8]

B

Apparently aware that Rule 31 did not provide it with a basis to preclude a retrial in these circumstances, the District Court concluded that it had the inherent authority to forbid the retrial and dismiss the indictment. The District Court erred.

The exercise of inherent authority must satisfy two requirements: (1) it "must be a reasonable response to the

---

to the defendant in deciding to dismiss an indictment. See Rossoff, 806 F. Supp. at 202; Ingram, 412 F. Supp. at 385-86. In this Circuit, however, "[t]he judiciary may not impose its personal and private notions of 'fairness' on law enforcement officials, but does have a limited authority to affect prosecutorial actions when those actions are taken in violation of the Constitution." United States v. Santtini, 963 F.2d 585, 596 (3d Cir. 1992) (citations omitted).

[8] Rule 31 differs from other Federal Rules of Criminal Procedure because it makes no mention of the court's authority. For instance, Rule 48(b) states that a court has authority to dismiss an indictment "if unnecessary delay occurs in: (1) presenting a charge to the grand jury; (2) filing an information against a defendant; or (3) bringing a defendant to trial." Fed. R. Crim. P. 48(b). There are other Rule-based grounds on which a district court could also dismiss an indictment, but each would be triggered by a motion, such as a motion to dismiss for failure to comply with Rule 16's discovery obligations if justice so requires, Fed. R. Crim. P. 16(d)(2)(D), or a motion asserting a defect in the indictment, Fed. R. Crim. P. 12(b)(3)(B).

problems and needs confronting the court's fair administration of justice," and (2) it "cannot be contrary to any express grant of or limitation on the district court's power contained in a rule or statute." Dietz v. Bouldin, 136 S. Ct. 1885, 1892 (2016) (citations and internal quotation marks omitted). We will examine each of these requirements in turn.

1

As to the first Dietz requirement, "[g]uided by considerations of justice, and in the exercise of supervisory powers, federal courts may, within limits, formulate procedural rules not specifically required by the Constitution or the Congress." United States v. Hasting, 461 U.S. 499, 505 (1983) (internal quotation marks and citation omitted). Such rules must be imposed (1) "to implement a remedy for violation of recognized rights," (2) "to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury," and (3) "as a remedy designed to deter illegal conduct." Id. (citations omitted). Thus, a court may exercise its inherent authority only when it is necessary to address improper conduct and ensure respect for the proceedings.

Under these principles, a court may dismiss an indictment based upon its inherent authority only if the Government engaged in misconduct, the defendant was prejudiced, and no less severe remedy was available to address the prejudice. See Bank of Nova Scotia v. United States, 487 U.S. 250, 254-56, 263 (1988); Chapman, 524 F.3d at 1087 (stating that "[a] court may dismiss an indictment under its supervisory powers only when the defendant suffers substantial prejudice and where no lesser remedial action is

13

available" (citations and internal quotation marks omitted)); United States v. Goodson, 204 F.3d 508, 514 (4th Cir. 2000) (observing that "a district court may not, in the management of its docket, exercise its discretion to dismiss an indictment with prejudice, either under Rule 48(b) or under its supervisory power, unless the violation caused prejudice to the defendant or posed a substantial threat thereof" (emphasis omitted)); United States v. Derrick, 163 F.3d 799, 808 (4th Cir. 1998) (holding that an indictment may not be dismissed for prosecutorial misconduct absent a showing that the misconduct prejudiced the defendants, and stating that "virtually every other circuit to consider the issue post-Hasting and Nova Scotia has also held that an indictment may not be dismissed based on prosecutorial misconduct, absent a showing of prejudice to the defendant"); United States v. Van Engel, 15 F.3d 623, 631-32 (7th Cir. 1993) ("A federal judge is not authorized to punish the misconduct of a prosecutor by letting the defendant walk, unless the misconduct not only violated the defendant's rights but also prejudiced his defense . . . ."); United States v. Tucker, 8 F.3d 673, 674 (9th Cir. 1993) ("[A] federal court may not exercise its supervisory authority to reverse a conviction or dismiss an indictment absent prejudice to the defendant."); United States v. Santana, 6 F.3d 1, 11 (1st Cir. 1993) ("[T]aken together, [United States v. ]Payner, [447 U.S. 727, 735 (1980),] Hasting, and Bank of Nova Scotia form a trilogy admonishing federal courts to refrain from using the supervisory power to conform executive conduct to judicially preferred norms by dismissing charges, absent cognizable prejudice to a particular defendant."); United States v. Isgro, 974 F.2d 1091, 1094 (9th Cir. 1992) ("Before it may invoke this [supervisory] power [to dismiss an indictment], a court must first find that the defendant is actually prejudiced . . . ."), amended by 43 F.3d 1480 (9th Cir. 1994).

14

In this case, there has been no misconduct. Indeed, the District Court noted that the Government performed diligently and professionally in both trials, Wright, 2017 WL 1179006, at *4, and found that the evidence was sufficient to prove beyond a reasonable doubt that Wright possessed the gun. The District Court nonetheless applied its own predictions about what another jury may do when presented with the same evidence, emphasized the need for finality, and opined that the effect of prosecution on the defendant precluded a proper prosecution from proceeding. See id. at *5-6. Invoking its own notions about the unfairness of requiring a defendant to face a retrial where the Government did not obtain a majority of the jurors' votes is an improper exercise of a court's supervisory power. United States v. Miller, 4 F.3d 792, 795 (9th Cir. 1993). Moreover, there is no prejudice to a defendant simply because he faces the anxiety and the normal stress of undergoing a trial. See United States v. Shepherd, 511 F.2d 119, 123 (5th Cir. 1975) ("[A]nxiety is present to some degree in virtually every case. Something more than the normal anxiety that accompanies a trial is necessary to show a degree of prejudice."); United States v. Clyburn, Crim. No. 89-0154 (JHG), 1991 WL 45749, at *2 (D.D.C. Mar. 22, 1991) ("The only real harm alleged is the general unfairness to these defendants in having to go forward yet again with a lengthy trial, in their being 'ground down' by the several months' drain on their mental, emotional, and financial resources. A lack of such fairness, however, does not alone violate due process."). Rather, prejudice sufficient for the District Court to intervene in a proper prosecution based upon its inherent authority occurs only where the Government engages in actions that place a defendant at a disadvantage in addressing the charges. That sort of prejudice is absent in this case.

Unless there is some constitutional basis, such as a due process violation, it makes sense to limit a court's authority to bar retrial to instances of prosecutorial misconduct and prejudice.  First, it ensures that a judge's personal preferences about a case do not influence whether the case proceeds.  See United States v. Santtini, 963 F.2d 585, 596 (3d Cir. 1992) ("The judiciary may not impose its personal and private notions of 'fairness' on law enforcement officials, but does have a limited authority to affect prosecutorial actions when those actions are taken in violation of the Constitution.").  Second, as more fully discussed below, it guarantees that a court limits the Executive's decision to prosecute only where there is a constitutionally sound reason to do so.[9]  This brings us to the second Dietz requirement.

_____

[9] For these reasons, we find unpersuasive our dissenting colleague's reliance on Eash v. Riggins Trucking Inc., 757 F.2d 557, 562 (3d Cir. 1985) (en banc), and particularly its observation that a court has the inherent power to resolve a case, as authority for allowing a court dismiss an indictment after successive hung juries.  As a general matter, there is no doubt that a court has the authority to dismiss a case, but it may not simply end a case because it decides that it should not be tried again.  Rather, as Bank of Nova Scotia, Chapman, and their progeny make clear, the court must point to evidentiary deficiency, prejudicial misconduct, or a constitutional basis, such as double jeopardy or due process, to justify precluding a prosecution.  If a court believed that the evidence was deficient, the prosecutor engaged in prejudicial misconduct, or a retrial would violate the constitution, then it has a basis to preclude a retrial.  Requiring such reasons for barring a retrial ensures that

16

The second <u>Dietz</u> requirement reminds a court that the exercise of its powers must be in accordance with the Constitution, statutes, and rules. 136 S. Ct. at 1892. Beginning with the Constitution, a court must be mindful of its role in our tripartite form of government and the doctrine of separation of powers. Separation-of-powers principles limit a court's inherent authority. "Regardless of whether the supervisory power stems from the federal courts' inherent power to check intrusions by other branches of government or whether it is a form of specialized federal common law, the separation-of-powers principle imposes significant limits on it," and "[p]roper regard for judicial integrity does not justify a 'chancellor's foot veto' over activities of coequal branches of government." <u>United States v. Gatto</u>, 763 F.2d 1040, 1046 (9th Cir. 1985) (internal quotation marks omitted) (quoting <u>United States v. Russell</u>, 411 U.S. 423, 435 (1973)).

In the criminal context, the Executive Branch has "broad discretion as to whom to prosecute," and this discretion "rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review." <u>Wayte v. United States</u>, 470 U.S. 598, 607-08 (1985) (citation and internal quotation marks omitted). A court is not equipped to evaluate

> [s]uch factors as . . . the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the

the ruling is not based on a court's own personal sense of whether a case is worthy of prosecution.

Government's overall enforcement plan . . . . Judicial supervision in this area, moreover, entails systemic costs of particular concern. Examining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy. All of these are substantial concerns that make the courts properly hesitant to examine the decision whether to prosecute.

Id.; see also In re Richards, 213 F.3d 773, 786 (3d Cir. 2000) (echoing similar sentiments with respect to Rule 48(a) dismissals). Thus, absent constitutional concerns, the decision to try or retry a case is at the discretion of the prosecutor. United States v. HSBC Bank USA, N.A., 863 F.3d 125, 129, 137-38 (2d Cir. 2017) (stating that the court's "role is not to act as superprosecutors, second-guessing the legitimate exercise of core elements of prosecutorial discretion, but rather as neutral arbiters of the law" (citation and internal quotation marks omitted)); United States v. Raineri, 42 F.3d 36, 43 (1st Cir. 1994) ("[T]he choice to forego permanently a prosecution is ordinarily made by the executive branch."); Tucker, 8 F.3d at 676 ("In maintaining order in our own house, we should not needlessly trample on the interest of the prosecutor and of the public in securing proper, lasting convictions."); Isgro, 974 F.2d at 1097 (stating that the doctrine of separation of powers "mandates judicial respect for the independence of the prosecutor," and "[d]ismissal of an indictment with prejudice

is the most severe sanction possible").[10]   Accordingly, separation-of-powers principles preclude a court from terminating a prosecution absent misconduct and prejudice to the defendant.  See Bank of Nova Scotia, 487 U.S. at 254-56, 263; Goodson, 204 F.3d at 514; Tucker, 8 F.3d at 674; Isgro, 974 F.2d at 1094.

In short, a court's power to preclude a prosecution is limited by the separation of powers and, specifically, the Executive's law-enforcement and prosecutorial prerogative. See Wayte, 470 U.S. at 607-08; HSBC, 863 F.3d at 137; In re Richards, 213 F.3d at 786; Raineri, 42 F.3d at 43; Tucker, 8 F.3d at 676; Isgro, 974 F.2d at 1095-97; Santtini, 963 F.2d at 596; Gatto, 763 F.2d at 1046.  Exercising inherent authority here to dismiss an indictment in the absence of misconduct and prejudice and based only on the fact that two juries could not reach a verdict intrudes on the Executive's domain and thereby violates the separation of powers.  See, e.g., HSBC, 863 F.3d at 138; Isgro, 974 F.2d 1091.

---

[10] Several state courts have also refused to recognize any inherent authority to dismiss an indictment to prevent a retrial.  See People v. Sierb, 581 N.W.2d 219, 225 (Mich. 1998); State v. Johnson, 821 S.W.2d 609, 613 (Tex. Crim. App. 1991) (en banc); State v. Sherrod, 383 So.2d 752, 753 (Fla. Dist. Ct. App. 1980).  Other states, however, have recognized a court's authority to dismiss an indictment sua sponte.  See State v. Sauve, 666 A.2d 1164, 1167-68, 1167 n.1 (Vt. 1995); Abbati, 493 A.2d at 521; Moriwake, 647 P.2d at 712; Witt, 572 S.W.2d at 917.  These latter cases are unpersuasive because they give too little weight to the separation of powers, a crucial constitutional principle in the federal system.

Finally, there is no statute or procedural rule that permits a court to bar a retrial in the absence of misconduct and prejudice. First, a court may not dismiss an indictment as a method to manage its own affairs.[11] See Hasting, 461 U.S. at 505. Second, a court's inherent power does not "include the power to develop rules that circumvent or conflict with the Federal Rules of Criminal Procedure." Carlisle v. United States, 517 U.S. 416, 426 (1996). Barring a retrial through the exercise of inherent authority circumvents the absence of power of the district court to dismiss an indictment in Rule 31(b). As stated above, courts have inherent authority to dismiss indictments, including, for instance, for prosecutorial misconduct if the defendant was prejudiced, Bank of Nova Scotia, 487 U.S. at 254-56, 263, but neither the Supreme Court nor our Court has extended a court's inherent authority to allow

---

[11] In Chambers, for example, the Supreme Court recognized a court's authority to impose silence, respect, and decorum based on its authority to manage its own affairs. 501 U.S. at 43. This authority has been exercised by controlling admission to the bar and disciplining its members; punishing for contempt, which penalizes disruption to proceedings and disobedience to court orders; disallowing fraud on the courts; ensuring the proceedings move forward; and curtailing litigation abuses. Id. at 43-45; see also Link v. Wabash R.R. Co., 370 U.S. 626, 629-31 (1962) (noting a court can dismiss a civil case for failure to prosecute to prevent delays and court congestion as part of a court's inherent power to manage its own affairs). Chambers and Link address how a court may manage its own proceedings, but they do not address how the court must also account for issues of separation of powers in the context of a criminal case.

the sua sponte dismissal of an indictment solely to preclude multiple mistrials following hung juries, see Chambers, 501 U.S. at 47; HSBC, 863 F.3d at 136.[12]

---

[12] Most cases concerning a court's inherent authority have arisen in the civil context. See Dietz, 136 S. Ct. at 1893 (noting a court's inherent powers to rescind a jury discharge order and recall a jury); Chambers, 501 U.S. at 44, 55-58 (recognizing a court's authority to vacate a judgment upon proof that a fraud was perpetrated on the court, and, in particular, to assess as a sanction the entire amount of the opposing party's attorney's fees); Link, 370 U.S. at 629-31 (authority to dismiss a civil case sua sponte for failure to prosecute); Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 507-08 (1947) (dismissing an action based on the doctrine of forum non conveniens). See generally Dietz, 136 S. Ct. at 1892-93 (citing cases involving the scope of a district court's inherent power); Eash, 757 F.2d at 561-64 (same).

There are other circumstances in which district courts lack the inherent authority to act, and most of those situations arise in the criminal context. See, e.g., Carlisle, 517 U.S. at 433 (holding that a court does not have authority to grant a post-verdict motion for judgment of acquittal, filed one day outside the time limit under Rule 29(e)); Williams, 504 U.S. at 45-50, 55 (holding that a district court does not have inherent authority to dismiss an indictment because the Government failed to disclose to the grand jury substantial exculpatory evidence; "[b]ecause the grand jury is an institution separate from the courts, over whose functioning the courts do not preside, we think it clear that, as a general matter at least, no such 'supervisory' judicial authority exists"); HSBC, 863 F.3d at 129, 135-37 (holding that the district court violated separation-of-powers principles by sua sponte invoking its

21

Thus, the District Court abused its discretion in barring a retrial and dismissing the indictment. [13]

## III

For the foregoing reasons, we will reverse and remand for further proceedings.

---

supervisory power to oversee the government's entry into and implementation of a deferred prosecution agreement).

[13] Our dissenting colleague says that our approach deprives the court from taking action "when warranted to protect the institutional integrity of the judiciary." Dissent at 3. We disagree. This approach recognizes a court's role in our tripartite system of government and ensures that a court intercedes when proceeding would violate the Constitution. Furthermore, our approach does not preclude a court from ending a case where the evidence is insufficient or the conduct of the prosecution is improper.

No. 17-1972, United States of America v. Raymont Wright

NYGAARD, *Circuit Judge, dissenting*

This appeal presents us with two issues: First, does a district court possess the inherent power to dismiss an indictment after serial hung juries, and second, did the District Court here abuse its discretion by dismissing this indictment after two of them.  I answer yes to the first and no to the second.  Because I view this to be a matter of substantial importance, I must respectfully dissent.[1]

As the majority notes, twice now, the Government has tried Raymont Wright for a violation of federal law: being a felon in possession of a firearm.[2]  Twice now, the Government has done so on the basis of essentially the same evidence at trials presided over by the same District Court. And twice now, two different juries could not reach a verdict. Thus, when the Government announced its intention to put Wright on trial for the third time, the District Court was skeptical. It asked for briefing on whether it possessed the inherent power to prohibit the Government from taking a

---

[1] Whether the District Court had the inherent power to dismiss the indictment is a legal question.  We employ a plenary standard of review to that issue.  *See United States v. Schiff*, 602 F.3d 152, 161 (3d Cir. 2010) (citing *United States v. Scott*, 223 F.3d 208, 210 (3d Cir. 2000)).  Whether the District Court appropriately exercised this power is reviewed for an abuse of discretion.  *Link v. Wabash R.R. Co.*, 370 U.S. 626, 633 (1962).

[2] *See* 18 U.S.C. § 922(g).

third turn, and if it did, whether the court should use that power.[3]  After hearing from both sides, the District Court concluded that its inherent power applied to this circumstance.  It then exercised its discretion to dismiss the indictment.

Neither the Government nor the majority disputes that district courts have the inherent authority to dismiss indictments under at least some circumstances.  Citing to *United States v. Hasting*,[4] however, the majority cabins that authority to those instances in which there is evidence of prosecutorial misconduct.  In my view, in so doing, the majority conflates and confuses the various powers of the court.  And it also hobbles the court's discretion to probe the impact on the fair administration of justice of those prosecutorial decisions that sit outside the definition of bad conduct but still pose—or threaten to pose—real institutional harm.

The executive office inheres prosecutors with the power to bring a case to trial.  The judicial office, on the other hand, inheres the court with the power to end a case.[5]  Both

---

[3] The District Court ordered the parties to "file cross briefs stating their position regarding whether the Court, through an exercise of its inherent authority, should prohibit or permit a second re-trial in this case." *United States v. Wright*, No. 14-cr-292, 2017 WL 1179006, at *1 (W.D. Pa. 2017).

[4] 461 U.S. 499, 505 (1983).

[5] *See Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 816 (1987)(Scalia, J. concurring)("The judicial power is the power to decide, in accordance with law, who should prevail in a case or controversy.  *See* Art. III, § 2. . . . [S]ince the

offices share a responsibility to safeguard the overall integrity of the judicial process. But when a prosecutor decides to proceed with another trial in the aftermath of multiple mistrials, who but the court is empowered to question the impact of the prosecutor's discretion on the fair administration of justice, particularly when the court has concerns that the proceedings—and the institution—will be tainted by the abuse of jury shopping? It could be argued that two mistrials may not in some instances be enough to inflict serious institutional damage. But, the majority's combined reliance on *Dietz v. Bouldin*[6] and Fed. R. Crim. P. 31(b)(3) to allow the prosecutor to bring an unlimited number of retrials, so long as she or he does not stray into the realm of "illegal conduct," provides the prosecutor with an unchecked power. This poses a threat to the integrity of the judiciary and contradicts the inherent responsibility and authority vested in the judiciary by the framers of the Constitution. Thus, it is the majority's decision—and not the District Court's exercise of its inherent authority—that violates the separation of power principles on which the majority relies. We must affirm that our trial court judges have the discretion, originating in the court's inherent power, to take proper action when warranted to protect the institutional integrity of the judiciary.

Here, the District Court mindfully struck the balance that is necessary anytime the power of the court and the

---

prosecution of law violators is part of the implementation of the laws, it is—at least to the extent that it is publicly exercised—executive power, vested by the Constitution in the President.") (footnote omitted)).

[6] 136 S. Ct. 1885, 1892 (2016).

power of the prosecutor intersect. Drawing from factors set out in *State v. Abbati*,[7] the District Court identified and investigated a circumstance that it identified as harmful to the institution and to the defendant: jury shopping. It also took note of the impact of serial retrials on the defendant. It then properly dismissed the indictment. Its use of the court's inherent discretion did not violate the separation of powers doctrine. To the contrary, it gave definition and substance to it.

I.

Some review is appropriate to illuminate how and possibly why I believe the majority confuses the court's various powers.

A.

Federal courts operate within a constitutional system that enumerates the powers of each branch of government, as set forth in the founding document. Article I restrains congressional power to those "legislative Powers granted herein."[8] By comparison, Article II vests the President with "the executive Power" without further description, limitation, or restriction.[9] Analogous to Article II, Article III conveys without restriction or limitation the "judicial Power" to federal courts.[10] Accordingly, the Supreme Court has—since at least 1812—recognized that "[c]ertain implied powers must

---

[7] 493 A.2d 513, 521-22 (N.J. 1985).
[8] U.S. Const. art. I, § 1.
[9] U.S. Const. art. II, § 1.
[10] U.S. Const. art. III, § 1.

4

necessarily result to our Courts of justice from the nature of their institution."[11]  "The moment the courts of the United States were called into existence and invested with jurisdiction over any subject, they became possessed of" inherent authority.[12]

Moreover, two bedrock purposes of the Constitution—checking the actions of the states and ensuring that Congress and the Executive do not overstep their boundaries—require a federal judiciary that exercises its own independent judicial power.  That is, it would be impossible for federal courts to discharge these vital duties if they lacked some inherent power beyond the reach of the Executive or the legislature.  I think of it this way: the elaborate measures set out in the Constitution to protect the independence of the judiciary (life tenure, removal from office only through impeachment, no decrease in salary during a judge's tenure, for example) would be meaningless if there were not some inherent, unimpeachable power vested solely in the federal courts.

In *Eash v. Riggins Trucking Inc.*,[13] we defined inherent power as vesting in federal courts upon their creation and as not deriving from any statute.  In this sense, the "judicial power" given to the federal courts by Article III of the Constitution is the "power to decide, in accordance with law, who should prevail in a case or controversy."[14]  No matter the description, this power is intrinsic to the judicial office and

---

[11] *United States v. Hudson*, 11 U.S. (7 Cranch) 32, 34 (1812).

[12] *Ex parte Robinson*, 86 U.S. 505, 510 (1873) (speaking of the inherent contempt power).

[13] 757 F.2d 557, 561 (3d Cir. 1985) (en banc).

[14] *Young*, 481 U.S. at 816 (Scalia, J., concurring).

cannot be inhibited by any rule or act of Congress.  As we have recognized, the boundaries of this power are often "nebulous" and "shadowy,"[15] and "it is not always possible to categorize inherent power."[16]  Yet, we have an outline.

In *Eash,* we identified three main classes or categories of inherent power:  1) inherent powers based in Article III, that is, the power of a lower federal court to decide a case over which it has jurisdiction; 2) those powers "necessary to the exercise of all others,"[17] and 3) powers that include those reasonably useful to achieve justice, which are "necessary only in the practical sense of being useful."[18]  Focusing on the first category, the inherent power to decide a case is "so fundamental to the essence of a court as a constitutional tribunal that to divest the court of absolute command within this sphere is really to render practically meaningless the terms 'court' and 'judicial power.'"[19]  In other words, powers

---

[15] *Eash*, 757 F.2d at 561 (citation omitted).

[16] *Id*. at 562.

[17] *Id*. (quoting *Roadway Express, Inc., v. Piper*, 447 U.S. 752, 764 (1980)).

[18] *Id.* at 563; *see also Am. Civil Liberties Union v. Holder*, 673 F.3d 245, 255-56 (4th Cir. 2011) (applying *Eash* factors); *In re Stone*, 986 F.2d 898, 901-02 (5th Cir. 1993) (per curiam) (adopting *Eash* factors).  In *Chambers v. NASCO Inc.,* the Supreme Court was urged to adopt our approach to inherent powers.  But the Court held that it "ha[d] never so classified the inherent powers and . . . ha[d] no need to do so now."  501 U.S. 32, 47 n.12 (1991).

[19] *Eash*, 757 F.2d at 562.  The third aspect of a court's inherent power is its authority to employ persons or instruments not connected with the court, such as experts and

6

in this category make a court a court; they are encoded into the judiciary's DNA. Courts have referred to this power as a court's "irreducible inherent authority"[20] and "the core Article III power."[21] It is nothing less than our ability to decide a case over which we have jurisdiction, without interference by Congress or the Executive.[22]

Drawing from this, when I refer to a district court's inherent power, I mean a "'[c]ertain implied power[] [that] must necessarily result to our Courts of justice from the nature of their institution,' [a] power[] 'which cannot be dispensed with in a Court, because they are necessary to the exercise of all others.'"[23] It is "grounded in the separation of powers concept," since to deny it and yet maintain an independent judiciary "is a self-contradiction."[24]

However, that is not to say that the court operates solely outside the realm of legislatively granted judicial

---

auditors, to assist in its decision-making function. This facet of inherent power is not in play here.

[20] *Id.*

[21] *Am. Civil Liberties Union v. Holder*, 673 F.3d at 256.

[22] *United States v. Klein*, 80 U.S. (13 Wall.) 128, 147 (1871), *Eash*, 757 F.2d at 562 (noting that courts may exercise this type of inherent power despite legislation to the contrary); *see also Michaelson v. United States ex rel. Chicago, St. P., M. & O. Ry. Co.*, 266 U.S. 42, 64 (1924) (acknowledging that the Constitution vests courts with some powers unalterable by legislation).

[23] *Chambers*, 501 U.S. at 43 (quoting *Hudson*, 11 U.S. (7 Cranch) at 34.).

[24] *Eash,* 757 F.2d at 562.

7

powers.[25]   In fact, the categorization scheme in *Eash* was intended largely as a means of explaining the relationship between inherent judicial powers and legislatively granted judicial powers.[26]   It is here that I believe the majority's analysis strays.

B.

The majority, the briefs, and the discussion at oral argument reveal what has become a commonplace but imprecise conflation of the terms "inherent power" and "supervisory power."[27]   The Government, while referencing the District Court's "inherent power," also referred to the court's "supervisory power," and its "inherent supervisory judicial authority."[28]   The Appellee covers the entire panoply, citing the District Court's "supervisory authority," its

---

[25] *See Hudson*, 11 U.S. (7 Cranch) at 33.

[26] *See In re Tutu Wells Contamination Litig.*, 120 F.3d 368, 384 n.14 (3d Cir. 1997), *overruled on other grounds by Cunningham v. Hamilton County, Ohio*, 527 U.S. 198 (1999).

[27] In *Eash*, we noted that "[t]he conceptual and definitional problems regarding inherent power . . . have bedeviled commentators for years," 757 F.2d at 561, and that "those cases that have employed inherent power appear to use that generic term to describe several distinguishable court powers," *id.* at 562.   We also noted that "this lack of specificity [has been compounded by courts] rel[ying] . . . on precedents involving one form of power to support the court's use of another." *Id.*

[28] *E.g.,* Appellant's Br. at 13, 16; Appellant's Reply Br. at 2, 14.

"supervisory power," and its "inherent power."[29]  At times, we too have been guilty of adding to the confusion.[30]  The erroneous interchangeability of these terms clouds an important distinction that is crucial to this appeal: the difference between inherent judicial powers and legislatively granted judicial powers.[31]  As noted *supra*, inherent "judicial power" is given to the federal courts by Article III of the Constitution.[32]  Through this grant, federal courts receive the "power to decide, in accordance with law, who should prevail in a case or controversy."[33]  The merging of the terms "inherent" and "supervisory" likely has its genesis in the fact that some inherent powers are supervisory in function, such as a federal court's inherent power "to supervise the administration of criminal justice."[34]

---

[29] *E.g.*, Appellee's Br. at 22, 26.

[30] *See, e.g., United States v. Accetturo*, 783 F.2d 382, 396 (3d Cir. 1986) (Sloviter, J., dissenting) (speaking of our "inherent supervisory power"); *see also United States v. Watkins*, 339 F.3d 167, 180 (3d Cir. 2003) (Nygaard, J., concurring) (referring to both a court's supervisory power and inherent power to dismiss a case under Fed. R. Crim. P. 48(b)).

[31] *In re Tutu Wells Litig.*, 120 F.3d at 384 n. 14.

[32] *See* U.S. Const. art. III, § 1.

[33] *Young*, 481 U.S. at 816 (Scalia, J., concurring).

[34] *United States v. Payner*, 447 U.S. 727, 735 n.7 (1980) (quotation marks omitted); *see also* Sara Sun Beale, *Reconsidering Supervisory Power in Criminal Cases; Constitutional and Statutory Limits of the Federal Courts*, 84 Colum. L. Rev. 1433, 1433-34, 1465, 1470 (1984) (identification of Article III "judicial power," not congressional acts, as the source of the Supreme Court's supervisory authority).

However, unlike inherent powers, a court's supervisory authority may come from, and can be limited by, acts of Congress or a court's own rules.[35] Supervisory power often speaks to the power "to mandate 'procedures deemed desirable from the viewpoint of sound judicial practice.'"[36] A court's use of supervisory power can usually be classified in one of three ways. First, supervisory power can refer to an appellate court's supervision of a district court, through the imposition of procedures in addition to those already imposed by federal statute or constitutional provision.[37] We have, for example, relied on our supervisory power over district courts to review the application of local rules of practice and procedure.[38] We have also used our supervisory power to

---

[35] *See, e.g., McNabb v. United States*, 318 U.S. 332, 340-41 (1943); *Hasting*, 461 U.S. at 505.

[36] *United States v. Moreno*, 809 F.3d 766, 780 (3d Cir. 2016) (quoting *Thomas v. Arn*, 474 U.S. 140, 146-47 (1985)).

[37] *See, e.g., Castro v. United States*, 540 U.S. 375, 384 (2003) (instructing district courts to notify pro se litigants about consequences of re-characterizing motions as ones seeking relief under 28 U.S.C. § 2255); *Thiel v. S. Pac. Co.*, 328 U.S. 217, 225 (1946) (announcing a new rule for the composition of federal juries); *Dunbar v. Triangle Lumber & Supply Co.*, 816 F.2d 126, 129 (3d Cir. 1987) (prescribing procedures for motions to dismiss based on the conduct of a litigant's counsel); *United States v. Bazzano*, 570 F.2d 1120, 1137-38 (3d Cir. 1977) (requiring district courts to state reasons for a criminal sentence).

[38] *See United States v. Wecht*, 484 F.3d 194, 204-05 (3d Cir. 2007).

prohibit certain jury instructions in the district courts[39] and to review attorney-client fee arrangements.[40] Second, Courts—both trial and appellate—also refer to their "supervisory power" when meaning their power to supervise pending litigation.[41] They can, for example, seal and unseal records,[42] reassign a case to a different judge on remand,[43] or disqualify an attorney on ethical grounds.[44] Lastly, the power of a federal court to supervise law enforcement officials can also be what a court intends when it speaks of its "supervisory

---

[39] *See United States v. E. Med. Billing Inc.*, 230 F.3d 600, 607-12 (3d Cir. 2000).

[40] *See Ryan v. Butera, Beausang, Cohen & Brennan*, 193 F.3d 210, 214 (3d Cir. 1999).

[41] *See, e.g., Carlisle v. United States*, 517 U.S. 416, 425-26 (1996) (acknowledging "supervisory power" of district courts over litigation before them).

[42] *See, e.g., Hagestad v. Tragesser*, 49 F.3d 1430, 1434 (9th Cir. 1995).

[43] *See Gov't of the Virgin Islands v. Walker*, 261 F.3d 370, 376 (3d Cir. 2001) (noting that, "[a]lthough it is the standard practice in the district courts and in this circuit that a case on remand is assigned to the judge who originally heard it, we can, in the exercise of our supervisory power, reassign this case to a different judge upon remand.") (quotation marks omitted).

[44] *In re Grand Jury Investigation*, 447 F. Supp. 2d 453, 456-57 (E.D. Pa. 2006) (collecting cases); *see also United States v. Moreno*, 809 F.3d at 780 (summarizing supervisory authority).

power."[45]   These powers broadly ensure that pending cases are managed uniformly and efficiently.

I concede that the boundary between supervisory authority that is inherent to the court and that which is granted by the legislature can, at times, be difficult to identify. However, these difficulties are irrelevant to this case because I conclude that the District Court here acted pursuant to its inherent power and not to any authority conferred by any statute or rule.   The District Court's action was not undertaken in supervision of pending litigation—two trials were already concluded and a potential third trial had not yet begun.  Nor was it exercised according to a rule of procedure or practice newly announced by an appellate tribunal. Moreover, its action was not a response to any prosecutorial misconduct or request from Wright to dismiss the indictment. There is simply no basis to conclude that the inherent power that the District Court exercised in this case derived from any legislative grant.

To the contrary, the specific power under review here is the power to dismiss an indictment after two mistrials because of deadlocked juries in each instance.  This power falls within *Eash's* first category of power because it is an inherent power to resolve a case.  A court, by its nature, must be able to dismiss with prejudice actions brought before it, just as it must have the power to decide cases and enter

---

[45] *See, e.g., United States v. Thompson*, 772 F.3d 752, 763 (3d Cir. 2014).   For a comprehensive discussion of the origins and uses of supervisory power, see Amy Coney Barrett, *The Supervisory Power of the Supreme Court*, 106 Colum. L. Rev. 324, 330 (2006).

judgments.[46]  Such exercises of power are fundamental to the essence of a court.  Were they not, the judicial system simply could not function.[47]

The inherent power to dismiss is "of ancient origin, having its roots in judgments of nonsuit and non prosequitur entered at common law," and so is a power that is part of the very nature of the judicial institution.[48]  It is incidental and necessary to the fair and efficient operation of the courts.[49]  Indeed, "the power to dismiss exists in many situations.  For example, a district court has the inherent power to dismiss sua sponte for lack of jurisdiction, or under the doctrine of forum non conveniens."[50]  Because the power to resolve a case by dismissing an indictment (in a criminal action) or a complaint (in a civil action) is fundamental to the essence of a court of justice, it cannot be interfered with.  Indeed, as two commentators have explained, "*McNabb*, other Supreme

---

[46] We have also noted that our power to remand is a subset of the inherent power to dismiss a case.  *See Bradgate Assocs., Inc. v. Fellows, Read & Assocs., Inc.*, 999 F.2d. 745, 750 n.4 (3d Cir. 1993).

[47] *See, e.g., Fitzgerald v. First E. Seventh St. Tenants Corp.*, 221 F.3d 362, 363-364 (2d Cir. 2000) (holding a district court has the inherent power to dismiss a case, sua sponte, if it determines that the action is frivolous or the court lacks jurisdiction over the matter).

[48] *Link*, 370 U.S. at 630.

[49] *See, e.g., Bowers v. Nat'l Collegiate Athletic Ass'n*, 564 F. Supp. 2d 322, 333 (D.N.J. 2008) (citing *Derzack v. County of Allegheny*, 173 F.R.D. 400, 411 (W.D. Pa. 1996), *aff'd without op.*, 118 F.3d 1575 (3d Cir. 1997)).

[50] *In re Prevot*, 59 F.3d 556, 565-66 (6th Cir. 1995).

Court cases, and an analysis of several lower court opinions addressing this precise issue should sufficiently dispel any notion that the federal courts lack the power to bar repeated attempts to obtain a conviction" following serial mistrials.[51] Thus, the District Court's action here was well within the boundaries of its inherent power.

Therefore, the majority's conclusion that "inherent authority," "supervisory power," and "supervisory authority" all refer to the same thing (while understandable given the rampant muddled references that persist) ultimately misses the point. The power at issue here is the inherent power of the court to decide a case: a power that is limited by the boundaries of reason and discretion and is subject to appellate review for abuse. It is not subject to the power of Congress or the Executive.

## II.

There is no dispute that district courts have the inherent power to dismiss indictments in at least some circumstance. The majority nevertheless concludes that the District Court lacked the power to do so in this case. The majority reaches that conclusion for three principal reasons, but none withstands scrutiny.

## A.

---

[51] Michael A. Berch & Rebecca White Berch, *The Power of the Judiciary to Dismiss Criminal Charges After Several Hung Juries: A Proposed Rule to Control Judicial Discretion*, 30 Loy. L.A. L. Rev. 535, 543 & nn. 42-43 (1997) (collecting cases).

First, the majority agrees with the Government's argument that the District Court's dismissal violated the Separation of Powers Doctrine. I agree that the District Court's dismissal implicates the separation of powers. But its actions were in furtherance—not in violation—of the doctrine. The separation of powers doctrine refers to the balance among the branches of Government which prevents one branch from disrupting the constitutional functions of another.[52]

Here, the majority concludes that, in dismissing the indictment after two hung juries, the District Court encroached on the independence of the Executive because it prohibited the prosecution from exercising its constitutional duty to enforce the laws of the United States. Certainly, the United States Attorney, as a member of the Executive Branch, has such a responsibility.[53] And, just as certainly, the decision to prosecute "is soundly within the discretion of the prosecutor, not the courts."[54] The Government's authority not to prosecute a case is clear as well.[55] But we see no sign that the District Court did anything to prevent the Government from fulfilling its duty. To the contrary, the Government was twice given a full and fair opportunity to

---

[52] *See, e.g., Clinton v. Jones*, 520 U.S. 681, 699-700 (1997); *Morrison v. Olson*, 487 U.S. 654, 696 (1988); *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 442-43 (1977); *Baraka v. McGreevey*, 481 F.3d 187, 201 (3d Cir. 2007).

[53] *See, e.g., In re Grand Jury*, 286 F.3d 153, 163 (3d Cir. 2002).

[54] *United States v. Talley*, 164 F.3d 989, 997 (6th Cir. 1999).

[55] *See, e.g., United States v. Quinn,* 728 F.3d 243, 255-56 (3d Cir. 2013).

15

present its case and makes no claim that the District Court ever prevented it from doing so. Having had those opportunities, the Government had no absolute right as a matter of separation of powers or otherwise to try again. As two commentators have explained, a district court's use of its inherent power to dismiss an indictment after serial mistrials does not raise "significant separation of powers concerns" because the nature of that inherent power means that federal courts "need not automatically defer to a prosecutor's decision to retry a defendant" in this situation.[56]

The majority nevertheless concludes that prosecutors have the unimpeded right to try persons for violating federal law based on an indictment as many times as they wish and that the separation of powers doctrine prohibits a federal court from interfering. This position is untenable because it is not a true reflection of the separation of powers. It is axiomatic that no one branch of government is completely divorced from the other two. In reality, "our constitutional system imposes on the Branches a degree of overlapping responsibility, a duty of interdependence as well as independence."[57] This overlap becomes problematic, of course, when it results in an encroachment (when an action of one branch might undermine the independence of another branch) or an aggrandizement (where one branch seeks "powers more appropriately diffused among separate Branches").[58]

---

[56] Berch & Berch, *supra* note 51, at 544.

[57] *Mistretta v. United States*, 488 U.S. 361, 381 (1989).

[58] *Id*. at 381; *see also In re Tribune Media Co.,* 799 F.3d 272, 285 (3d Cir. 2015) (Ambro, J., concurring).

But recognizing a district court's right to prohibit a retrial following serial mistrials does not implicate these concerns. To the contrary, and putting the shoe on the other foot, the Government's position that nothing limits its opportunity to try and retry a defendant as many times as it chooses violates the judicial branch's constitutional mandate to exercise its judicial power. Just as the filing of an indictment is an exercise of executive power, the dismissal of one is an exercise of judicial power. The unlimited serial prosecutions that the Government advocates for, and that the majority permits, would limit a court's authority to dismiss an indictment to only those instances in which the prosecutor steps outside the bounds of professional conduct. But our independence as an institution of government must include an ability to adjudicate, and thus dismiss with prejudice, individual cases when a district court, in its discretion, has concerns about the impact of serial retrials on the institution and the defendant. We view the prosecution of a defendant after deadlocked juries as a tipping point in balancing the separation of powers. As the repeated prosecutions increase, so too does the judiciary's power to limit them. As we stated in *Eash*, and as we said *supra*, a court's exercise of its inherent power to dismiss an indictment after retrials does not violate the separation of powers but is grounded in it.[59]

## B.

Second, and relatedly, the majority concludes that the District Court's dismissal was in violation of Fed. R. Crim. P. 31(b)(3), which the majority claims confers on prosecutors the unlimited discretion to retry defendants following serial

---

[59] *See Eash*, 757 F.2d at 562.

mistrials. Rule 31 does nothing of the kind. Rule 31 provides in relevant part that "if a jury cannot agree on a verdict on one or more counts, the court may declare a mistrial on those counts. The government may retry any defendant on any counts on which the jury could not agree."[60] The Supreme Court adopted this rule in its original form in 1944 as a "restatement of existing law."[61] The Supreme Court itself appears never to have cited Rule 31(b)(3), and neither the few Courts of Appeals to have done so[62] nor its Advisory Committee Notes have discussed its history or purpose in any detail. Arguably, the rule's reference to the prosecutor's general ability to retry a defendant following a mistrial may be nothing more than a recognition of the longstanding principle that retrials following mistrials are not prohibited by the Double Jeopardy Clause,[63] which is not at issue here.

In any event, this rule does not by its terms prohibit district courts from dismissing indictments following serial mistrials. District courts have the inherent power to do so as explained above. A district court's exercise of that power could be contrary to Rule 31(b)(3) only if the rule contained an "express grant of or limitation on" that power.[64] It does not. The rule does not mandate a retrial after a mistrial. Nor

---

[60] Fed. R. Crim. P. 31(b)(3).

[61] *Id.* advisory committee's note to 1944 adoption.

[62] *See United States v. Melendez*, 775 F.3d 50, 57 (1st Cir. 2014); *United States v. Warren*, 593 F.3d 540, 546 (7th Cir. 2010); *United States v. Fort*, 472 F.3d 1106, 1111 n.3 (9th Cir. 2007); *United States v. Gotti*, 451 F.3d 133, 137 (2d Cir. 2006).

[63] *See United States v. Perez*, 22 U.S. 579, 580 (1824).

[64] *Dietz*, 136 S. Ct. at 1892.

18

does it contain any other limitation on the district court's power to prohibit one.  In fact, the rule does not even mention that issue.[65]  Thus, as  the Supreme Court has noted in addressing other rules of court, "[i]t would require a much clearer expression of purpose than [this rule] provides for us to assume that it was intended to abrogate" the district courts' inherent power.[66]  Put simply, when there have been multiple mistrials and the prosecutor seeks to try the case again, Rule 31(b)(3) does not purport to reduce the role of the district courts to that of a rubber stamp.

## C.

Finally, the majority claims that a district court can exercise its inherent power to dismiss an indictment only if there is evidence of willful bad faith or prosecutorial misconduct on the part of the government and resultant prejudice to the defendant.  It cites to numerous decisions that it says supports this position.[67]  But none of these cases deals

---

[65] The majority claims that Rule 31(b)(3)'s silence on this issue supports the proposition that district courts lack the authority to dismiss an indictment following serial mistrials.  But because district courts have the inherent power to do so as explained above, the question is not whether Rule 31(b)(3) *permits* district courts to dismiss an indictment in that circumstance.  The question instead is whether Rule 31(b)(3) *prohibits* them from doing so.  It does not.

[66] *Link*, 370 U.S. at 631-32.

[67] *See Bank of Nova Scotia v. United States*, 487 U.S. 250, 254-56, 263 (1988); *United States v. Chapman,* 524 F.3d 1073, 1087 (9th Cir. 2008); *United States v. Goodson*, 204 F.3d 508, 514 (4th Cir. 2000); *United States v. Derrick*, 163

19

with the particular circumstance we face here: the decision to retry a defendant after serial mistrials.[68] In fact, many are dismissals due to prosecutorial misconduct. The majority's reliance on such decisions is misplaced because it ignores the fact that the dismissal in this case was not punitive in nature; it was not a sanction for misconduct.[69] As two commentators have explained, "[a]lthough the inherent power principle has usually involved cases of misconduct by the parties or a vindication of statutory principles, the doctrine is not so limited."[70] To the contrary, courts may use their inherent authority to dismiss indictments whenever necessary to vindicate "principles of fairness to the defendant and the interests of the public in the effective administration of justice."[71]

That is just what the District Court did here. The Government asked the District Court to dismiss *without* prejudice "[e]ven if this court were inclined to dismiss the case."[72] Yet the Government proffered no additional

---

F.3d 799, 808 (4th Cir. 1998); *United States v. Tucker*, 8 F.3d 673, 674 (9th Cir. 1993) (en banc); *United States v. Van Engel*, 15 F.3d 623, 631-32 (7th Cir. 1993); *United States v. Santana*, 6 F.3d 1, 11 (1st Cir. 1993); *United States v. Isgro*, 974 F.2d 1091, 1094 (9th Cir. 1992).

[68] *Derrick* does deal with a dismissal of the indictment after an initial grant of a retrial, but the circumstance differs from this case because the mistrials were not due to deadlocked verdicts. *See* 163 F.3d at 803

[69] *Cf., e.g.*, *Isgro*, 974 F.2d at 1097.

[70] Berch & Berch, *supra* note 51, at 548.

[71] *Id.*

[72] *Wright*, 2017 WL 1179006, at *7.

evidence it would present if Wright was re-indicted. It asked to try the same case again before a third jury, merely hoping for a different result. The District Court's dismissal of the indictment with prejudice was based on the merits, or lack thereof, of the Government's request, no more and no less.

Moreover, the dismissal was not, as the majority contends, a general declaration of unfairness simply because the government failed to obtain a conviction.[73] Nor was it merely an attempt to shield the defendant from the anxiety of a retrial.[74] Reference to *Miller* and *Shepherd* misconstrues not only the circumstance of this case, but also the gravity of the District Court's concern. As I discuss next, the District Court weighed many factors, mindful of the importance of each, before making its decision. From all of this—even taking into account the separation of powers and Rule 31(b)(3)—it is evident to me that the District Court correctly concluded it had the inherent authority to act upon the prosecutor's decision to retry this case in the wake of two mistrials.[75]

---

[73] *See United States v. Miller*, 4 F.3d 792, 795 (9th Cir. 1993).
[74] *See United States v. Shepherd*, 511 F.2d 119, 123 (5th Cir. 1975); *see also Arizona v. Washington*, 434 U.S. 497, 503-04 (1978).
[75] Although we conclude that the District Court appropriately exercised its inherent power as a court of law to dismiss an indictment, thus placing its actions within *Eash's* first category, the District Court appeared at one point to tether its dismissal to its "inherent authority to effectuate . . . the speedy and orderly administration of justice and to ensure fundamental fairness." *Wright*, 2017 WL 1179006, at *2. These actions are typically associated with the second

## III.

Before moving to the actual merits of the District Court's decision, a word of caution is in order. Just because a court has inherent power to dismiss an indictment after a retrial does not mean it should always be exercised.[76] My dissenting opinion today should not be interpreted as an endorsement of unchecked and ungrounded judicial power. Nor should it be interpreted as permitting district courts in this Circuit to dismiss indictments without a significant basis for doing so. Moreover, nothing in this opinion should be read as limiting reprosecution to two trials. Cases no doubt exist where a third or fourth trial on the same indictment may be appropriate where the evidence so indicates. It is simply my conclusion that, in some cases, and in the proper exercise of its discretion, a district court has the inherent power to prohibit continued re-prosecution by dismissing an indictment.

## IV.

This is such a case. The District Court here rightly proceeded with the Government's request for another trial with deliberate caution. Recognizing the lack of guidance

---

classification of *Eash's* powers. *See Eash*, 757 F.2d at 562-563. Nonetheless, it invoked the inherent power of the court and dismissed the case and it is on this basis that I conclude the District Court did not reach the boundaries of its power.

[76] *See Lopez v. United States* 373 U.S. 427, 440 (1963); *see also Chambers*, 501 U.S. at 44 ("Because of their very potency and discretion, inherent powers must be exercised with restraint and discretion.").

from this Court, the District Court turned to a decision of the Supreme Court of New Jersey. In *State v. Abbati*,[77] that court listed several factors a trial court should consider before dismissing an indictment after several hung juries. These factors are valid inquiries and include

- the number of previous mistrials and the outcome of the juries' deliberations, as far as can be determined;
- the character or nature of the previous trials, considering their length, complexity of issues, and similarities in evidence;
- the probability that any subsequent trial will be much different from the previous ones;
- the relative strength of the party's case, as determined by the trial court;
- the conduct of counsel during the previous trials.[78]

In considering these factors, a district court must also accord appropriate weight to the Government's decision to continue prosecution, giving deliberate consideration to the reasons for that choice.[79]

Other considerations might include the seriousness of the crimes charged, the public's interest in the effective resolution of criminal charges, and the criminal defendant's circumstances, including the impact that continued prosecution might have on him or her and the potential for

---

[77] 493 A.2d 513.

[78] *Id.* at 521-22.

[79] *See id.*

unfairness or unnecessary hardship.[80]  The factors just outlined are not an exhaustive list and district courts could consider other things that are reasonably useful in answering whether further prosecutions after deadlocked juries should be permitted.  Moreover, all of these elements of inquiry enable the court to assess the impact that a serial retrial has on the integrity of the judiciary as an institution.

These avenues of inquiry make sense to me.  Take differences in evidence, for example.  If the evidence would be different at a retrial, then there seems little chance that continued prosecution should be curtailed.  If, on the other hand, there would be no substantial difference in evidence, concern about re-prosecution is appropriate.  So too the number of deadlocked juries is an important consideration.  Continued prosecution after two, three, or even four deadlocked juries could unbalance the scale.  By inquiring into the seriousness of the charges, a district court could compare the crime being prosecuted to other cases when a court dismissed an indictment after deadlocked juries.    In other words, a district court must make sufficient findings and establish a sufficient record supporting its decision, thus enabling a court of appeals to accurately assess whether the district court abused its discretion or not.   That is what the District Court did here.

I see no abuse of discretion in the District Court's exercise of its inherent powers.  The District Court's ruling was not arbitrary and instead was based on a thorough, careful, and balanced consideration of the above factors. The District Court first acknowledged the weight of its actions

---

[80] *See id.*

within our constitutional scheme. It then found that the evidence suggested that the deadlock was not the result of a lone holdout. As to the character of the preceding trials, the District Court noted the Government's position that this was a "simple" case. It also stated that both previous trials were "virtual duplicates" and that counsel on both sides was the same for both prosecutions. The District Court further observed the lack of any allegation of jury nullification or bias. Instead, it found that "there is every indication that the two juries engaged in deliberations in good faith, and, despite their best efforts, were unable to reach a verdict."

The District Court also considered the strength of the parties' respective cases and determined that its opinion on this factor was irrelevant, given that two separate juries had concluded that the Government failed to meet its burden of proof. It commended the professionalism and hence the effectiveness of counsel on all sides, which it weighted as favoring disallowing any further prosecution. The District Court specifically considered the seriousness of the crime charged, and it noted that other courts had dismissed indictments when the charges were far graver.[81] Lastly, the District Court thoroughly balanced the Government's authority to prosecute against the effect of continued prosecution on Wright. Recognizing that Wright has been on bond since July of 2014, and on home detention for nearly two years, the District Court concluded that this inquiry tipped in his favor.

---

[81] *Wright*, 2017 WL 1179006, at *6 (citing *United States v. Ingram*, 412 F. Supp. 384, 385 (D.D.C. 1976); *State v. Moriwake*, 647 P.2d 705, 708 (Haw. 1982); *Abbati*, 493 A.2d at 517; and *State v. Witt*, 572 S.W.2d 913, 914 (Tenn. 1978)).

## V.

In conclusion, I see no abuse of discretion in the District Court's careful and thorough balancing of relevant factors, a balancing which led it to invoke its inherent power and to dismiss the Government's indictment of Wright. For all of these reasons, I respectfully dissent from my esteemed colleagues in the majority. I would affirm.

McKEE, *Circuit Judge*, concurring in the judgment.

As I shall explain, I am sympathetic to what the District Court was trying to do in this case and I think I understand why the court acted as it did. Moreover, I agree with Judge Nygaard insofar as he posits in dissent that a District Court can step in at some point and bar a retrial without infringing on the separation of powers. Nevertheless, despite my belief that the separation of powers doctrine is not necessarily violated by a trial court barring a retrial after successive mistrials, and despite my belief that the District Court was trying to act in a manner that would assure a measure of justice for Wright, I concur in the judgment reversing the District Court. I simply do not believe that the current state of the law supports the District Court's action in the absence of prosecutorial misconduct, bad faith, or more than two unsuccessful trials. Since the record is clear that the District Court found neither prosecutorial misconduct nor bad faith, I concur in the judgment reversing the court's order but feel compelled to write separately to explain why.

I.

At the outset, it is important to note that I do not believe that a trial court lacks the power to, at some point, call a halt to successive prosecutions following deadlocked juries, and I do not read Judge Shwartz's opinion as standing for that principle. The Government even conceded at oral argument that there could come a point where successive prosecutions become so onerous and burdensome that additional trials rise to the level of a Due Process violation which a trial court is clearly empowered to prevent. Moreover, in *Barkus v. Illinois*,[1] the Supreme Court noted that there "may" come a point where multiple prosecutions become so harassing that they violate the Due Process Clause.[2]

Here the evidence in both trials consisted solely of police testimony. According to the officers' testimony, some residents of the community witnessed crucial parts of Wright's encounter with the police, but they did not testify. Similarly, Wright did not testify on his own behalf, nor did the defense put on a case. His theory was that he had no way of knowing

---

[1] 359 U.S. 121 (1959).
[2] *Id.* at 127.

1

that the men in plain clothes and unmarked cars who began pursuing him were police; he panicked, sped away, and crashed; and police subsequently planted the gun at the scene. Wright also asserted that the officers chose not to test the gun for DNA or fingerprints because they knew the results would contradict their story. In an effort to counter Wright's argument from the first trial that police decided not to test the gun for fingerprints and DNA in order to hide their malfeasance, the Government called experts at the second trial "who testified about the difficulty of retrieving DNA and fingerprint evidence from firearms."[3]

Nevertheless, the Government's case depended entirely on the testimony of police officers who had worked together for many years and/or knew one another. Over the span of ten months, the District Court twice listened to the police testimony during the trials. That testimony was at times contradictory and at other times strained credulity.

At the first trial, Detective Fallert, who first noticed Wright speeding, testified that Wright was travelling at 90 mph, but he did not note that in his police paperwork nor did he note it at the pretrial hearing. His contemporaneously prepared investigative report also did not claim that Wright was initially speeding. Detective Henson, who took over the chase, testified that he saw Wright holding a handgun, but conceded that he had no way of knowing whether Wright knew he was a police officer when the pursuit began. Lastly, Detective Baker testified similarly to Henson, yet guessed that Wright had been going at a speed of 60 mph and accelerated. This is a very substantial discrepancy, especially for seasoned police officers who can be expected to have some expertise and experience in estimating the speed of an automobile.

In the second trial, the Government called the same witnesses, with the exception of Detective Fallert. Notably, this time Detective Henson testified he actually did not see Wright speeding. Two different juries found themselves deadlocked—unable to convict or acquit.

## II.

The majority opinion suggests that the District Court's

---

[3] Appellant Br. at 11.

decision to dismiss the indictment with prejudice impermissibly infringed upon the jury's role. Judge Shwartz states: "[t]he District Court nonetheless applied its own predictions about what another jury may do when presented with the same evidence," and concluded that was "an improper exercise of a court's supervisory power."[4] However, it is difficult to know whether the District Court ruled as it did based upon a belief that a third jury presented with the same evidence would be unable to reach a verdict or whether it simply shared the doubts that some of the jurors obviously had about the veracity of police officers' testimony.

In any event, either scenario poses exactly the same issue about a court overstepping its bounds and infringing on the role of a jury as well as prosecutorial discretion. As I stated at the beginning, to the extent that a trial judge can intervene and dismiss an indictment, I am skeptical that this record supports such an assertion of judicial authority. Nevertheless, there is more support for the judge's actions here than our reversal suggests.

It is not a novel proposition that a trial judge must "ensure that any and all . . . evidence is not only relevant, but also reliable."[5] "The trial judge's role is to preside over the trial; passively if possible but aggressively when indicated."[6] Thus, the law allows for trial courts to channel the jury's judgment in certain circumstances. Here, the court's decision would prevent another jury from hearing the same evidence that has failed to convict Wright on two prior occasions.

There are situations in which judges must act as "gatekeepers" and ensure the reliability of evidence before a jury is able to consider it. Accordingly, in an admittedly very different context, the Supreme Court has described trial judges as gatekeepers of evidence.[7] "[A] gatekeeping role for the

---

[4] Maj. Op. 13–14.

[5] *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997) (citing *Daubert v. Merrill Dow Pharms.*, 509 U.S. 579, 589 (1993)).

[6] *Holdnrook v. Lykes Bros. Steamship Co.*, 80 F.3d 777, 788 (3d Cir. 1996).

[7] *Daubert*, 509 U.S. at 597.

judge, no matter how flexible, inevitably on occasion will prevent the jury from learning of authentic insights and innovations."[8]

Despite the importance of the jury system, and the faith we place in juries, the law has thus traditionally recognized the danger that jurors may not be able to restrict their deliberations to admissible evidence and that they may return a verdict based on factors other than the evidence presented at trial. For example, Federal Rule of Evidence 403 allows courts to prevent jurors from learning of certain testimony (even uncontradicted testimony) if the court concludes that the testimony could cause a jury to reach a verdict based more on emotion or prejudice than on evidence.[9]

The best known example of how courts are empowered to limit what a jury can consider may well be the body of law that has developed in the wake of the Supreme Court's decision in *Daubert*. In *Daubert*, the Court stated: "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."[10] We certainly could, but do not, allow the jury to determine whether the scientific evidence is reliable in the first instance based upon testimony at trial. Instead, that preliminary factual determination rests solely with the trial court if the reliability is challenged.

The difficulty with relying on this body of law here is, of course, the fact that the trial court's dismissal of Wright's indictment was not limited to an intrusion into the jury-box. More fundamentally, and more importantly, it also trespassed on the separation of powers, and concomitantly, on the prosecutorial discretion that is endemic in that concept.

Despite Judge Nygaard's thoughtful attempt to address that issue and the jury's obvious concerns regarding the

---

[8] *Id.*

[9] *See, e.g.*, *United States v. Bailey*, 840 F.3d 99, 117, 121–23, (3d Cir. 2016) (finding that the probative value of video evidence of murder committed by coconspirators was substantially outweighed by risk of unfair prejudice).

[10]*Daubert*, 509 U.S. at 589.

4

testimony of police officers in this case, I am not convinced that the United States Supreme Court would agree that the inherent powers of a trial court are broad enough to justify what happened here.

The Government clearly has the inherent authority to decide not to retry Wright given all of the circumstances in this case, including the seemingly improbable account of what happened,[11] the conflicting nature of the police testimony and the jurors' apparent trouble with it, the fact that there is no additional evidence to offer at a third trial, and Wright's apparent steps toward rehabilitation since the offense which disqualified him from lawfully owning a firearm, as well as any other factors that the Government might appropriately consider.[12] However, I can find no authority that convinces me that the United States Supreme Court would agree that a trial court's inherent authority allows it to dismiss an indictment with prejudice on this record.

III.

---

[11] According to the officers' accounts, they watched (in the open and without cover) as Wright fumbled in the back of a car with tinted windows and came out holding a gun. They then continued to stand and watch from approximately 25 yards away—without cover and without taking any actions to protect themselves—as he attempted to rack the slide which would have placed a bullet in the chamber.

[12] Appellee argues without contradiction that:

> [f]ollowing early involvement with the criminal justice system, Mr. Wright began to turn his life around, returning to school and earning his Associates degree in Computer Management-Networking Engineering Technology[,] . . . a Bachelor of Science degree in Information Technology and Management . . . graduating *cum laude*[,] . . . and . . . a Master of Science degree.

Appellee Br. at 52.

5

As I noted at the outset, the Government agrees that successive prosecutions *can* rise to the level of a Due Process violation, which a court clearly could remedy by dismissing an indictment. However, the Government strenuously argues Wright's prosecution has not yet reached that point. The Government's position inherently argues that the court's action here is also not justified by any concept of fundamental fairness. In *Ake v. Oklahoma*,[13] the Supreme Court observed that the right to Due Process includes the "guarantee of fundamental fairness."[14] As has been discussed by Judge Shwartz, the District Court here relied on the decision of the New Jersey Supreme Court in *State v. Abbati*.[15] There, the New Jersey Supreme Court affirmed a trial court's dismissal of an indictment with prejudice after two juries deadlocked, resulting in mistrials.[16] That situation is on "all fours" with the circumstances here and the District Court relied heavily on that decision to justify its action and fashion a rule that would properly allow a trial court to dismiss an indictment with prejudice under certain circumstances.[17]

However, the New Jersey Supreme Court based its decision on the inherent authority of state courts under the New Jersey Constitution.[18] It did not purport to rest its decision on the U.S. Constitution and, with very limited exception, it cited to state judicial decisions—not federal ones—in discussing when consecutive hung juries justified dismissing an indictment with prejudice.[19] The holding of the Court is

---

[13] 470 U.S. 68 (1985).

[14] *Id*. at 76.

[15] 493 A.2d 513 (N.J. 1985).

[16] *Id.* at 522.

[17] *See United States v. Wright*, Crim A No. 14-292, 2017 WL 1179006, at *3, *4 (W.D. Pa. Mar. 30, 2017).

[18] *Abbati*, 493 A.3d at 517–18.

[19] *Abbati* cited to *Ake*, for the general proposition that the "requirement of fundamental fairness [is] grounded in [the] fourteenth amendment's due process guarantee." 493 A.2d at 518. However, with the exception of a single District Court case, the Court cited numerous state court cases for the proposition that a trial court had the inherent authority to dismiss an indictment with prejudice after two juries deadlocked. *Id.* at 519–20. It concluded by finding "[t]hese

6

summarized in its statement that the "judicial responsibility for the proper administration of criminal justice also gives rise to the inherent power to dismiss an indictment in appropriate circumstances."[20]

The *Abbati* standard has not been discussed by this Court (aside from in the instant case), let alone adopted by it. Although some of the factors used by the New Jersey Supreme Court are analogous to considerations federal courts have made in similar federal cases, such as *United States v. Ingram*[21] and *United States v. Rossoff*,[22] *Abbati* has no real corollary in federal case law.[23]

---

examples of the courts' exercise of their power to administer the criminal justice system assist in answering the further argument of the State that recognition of an inherent judicial power to dismiss an indictment with prejudice would overstep the separation of powers." *Id.* at 520. *Abbati* dismissed that argument based upon its belief that "[t]he separation of powers is not an end in itself, but a general principle intended to ensure that the system of checks and balances remains vital." *Id.* at 521 (citing *State v. Leonardis*, 375 A.2d 607, 612 (N.J. 1977)).

[20] *Id.* at 520.

[21] 412 F. Supp. 384 (D.D.C. 1976). The District Court of the District of Columbia dismissed an indictment after two trials in which twenty-one of twenty-four jurors voted to acquit. The court found no prosecutorial misconduct. *Id.* at 386. It instead considered the issue a "matter of fair play," emphasizing that "[t]he Government has no new proof; it simply wants another chance" and "simply wishes to keep pressing so long as juries disagree in the hope that a conviction eventually will result." *Id.* at 385.

[22] 806 F. Supp. 200 (C.D. Ill. 1992).

[23] For example, the first prong of *Abbati*'s analysis concerns the number of mistrials and the outcome of the juries' deliberations. 493 A.2d at 521. Both *Rossoff* and *Ingram* took this into account in dismissing indictments. *See Rossoff*, 806 F. Supp. at 203 (naming, as "additional compelling circumstances: 1) the majority of jurors in both cases found Dr. Rossoff Not Guilty; 2) if not for the allegedly biased juror in the second trial, Dr. Rossoff would have been acquitted on all counts; 3) the two trials have taken over one solid month

7

Accordingly, as I noted at the outset, I am sympathetic to the District Court's efforts given the totality of the circumstances here. However, until Congress or the United States Supreme Court determines otherwise, I agree that we have no alternative but to enter judgment reversing the District Court. I therefore concur in the judgment reversing the District Court's order.

---

of the Court's time"); *Ingram*, 412 F. Supp. at 385 ("The proof was legally sufficient to support a conviction in each instance but the juries simply did not credit the witnesses, voting 10–2 and 11–1 for acquittal.").

The *Abbati* standard is also based on the likelihood of any substantial difference in a subsequent trial, which the *Ingram* decision also considered. *See Ingram*, 412 F. Supp. at 385 ("If another trial takes place there is every reason to believe the jury will again be divided or will acquit.").

Finally, *Rossoff* and *Ingram* both made determinations similar to *Abbati*'s seventh prong, the status of the individual and the impact of a retrial upon the defendant in terms of untoward hardship and unfairness. 483 A.2d at 422; *see Ingram*, 412 F. Supp. at 385–86 ("Here is a man in jail now more than seven months primarily because of an offense which the Government is unable to convince a jury he committed. . . . To permit a retrial, after 21 of 24 jurors have already refused to convict, is to ignore the reasonable doubt standard."); *Rossoff*, 806 F. Supp. at 203 ("Dr. Rossoff is 71 years of age and in poor health. He has had heart surgery, suffers from severe anemia and at the time of the second trial was on experimental treatment. He has been under great physical and emotional strain as the result of these repeated trials and was even hospitalized immediately following the second trial.").

8